STATE OF CONNECTICUT *v.* ROLAND GUERTIN
(10536)
(10537)

SPEZIALE, C. J., PETERS, PARSKEY, SHEA and GRILLO, Js.

Argued April 6—decision released June 21, 1983

*Eugene J. Riccio,* assistant public defender, for the appellant (defendant).

*Jonathan C. Benedict,* assistant state's attorney, with whom, on the brief, was *Donald A. Browne,* state's attorney, for the appellee (state).

PARSKEY, J. The defendant was charged in two separate informations with the crimes of sexual assault in the first degree and burglary in the second degree in violation of General Statutes §§ 53a-70 (a) (2) and

53a-102 (a) respectively. After a trial to the jury the defendant was convicted of both crimes. From the judgment subsequently rendered the defendant has appealed.

Prior to trial, the defendant moved to dismiss the informations claiming that his warrantless arrest was without probable cause and that the manner of his arrest in his room was improper. Further, the defendant moved to suppress any identification testimony by the complainant on the ground that the pretrial identification procedure was unnecessarily suggestive. The defendant also moved to suppress those items seized from his person at the time of his arrest and from his room, pursuant to a warrant, seven days after the crime. He claimed that the arrest was illegal and that the information relied upon in the warrant was obtained by a violation of his constitutional rights against unreasonable search and seizure. After an evidentiary hearing, these motions were denied. In his appeal the defendant assigns error in these rulings.

I

## WARRANTLESS ARREST

The burglary and sexual assaults occurred in the early morning of December 6, 1979. The complainant had arrived at her apartment at 11 p.m. the night before from a Christian Science meeting and went to bed; however, before falling asleep, she heard loud footsteps on the porch outside her window and observed a man at that location. She alerted the apartment's doorman who was able to find nothing. She then retired for the night.

At about 1 a.m. the complainant awoke, having heard something that made her conscious of a form in her room. She called out to her roommate (who was not

there), received no answer, and quickly sat up and turned on the floor lamp at the foot of her bed. At that, a form, obviously a man, raced across the room and knocked over the lamp, leaving the room in darkness except for light coming from a digital clock-radio located about eight feet from and facing toward the bed and whatever light may have emanated from a large window over the bed having transparent curtains and a venetian blind left about one-fourth up.

The intruder, subsequently identified as the defendant, remained in the room until leaving somewhere between 4:30 and 5 a.m. During this period the victim was subjected to repeated and varied sexual assaults committed under express and implied threats of violence. She was blindfolded with a scarf for between one-half and three-fourths of the time. For the remainder of the period she was able to observe the defendant's face from as close as two inches and, for approximately one-half hour of the nonblindfolded portion, talked with him while lying within inches of his face. She was able to make out the defendant's features very well, particularly once her eyes had adjusted to the darkness.

After the defendant's departure, the victim phoned the police and reported the sexual assault. Upon the arrival of the police at her apartment, she described her assailant as a caucasian male, five feet eight to five feet ten inches tall, having a very short, military-like haircut and a pig-type nose and wearing dark trousers and a dark shirt and shoes that made quite a bit of noise on the floor. She was unable to describe anything of the footwear other than that they made noise. She also stated that the rapist told her that he had been drinking scotch and was arrogant to her in his mannerisms. At this point, Officer Lawrence Connors of the Greenwich Police Department, one of the officers

present, indicated that he thought he knew who it was. Connors stated that he had picked up a man earlier that night who fit the victim's description; who had mentioned that he had been drinking scotch and water; and who lived at the Greenwich YMCA.

Connors had his first contact with the defendant at about 9 p.m., December 5, at the Greenwich YMCA in regard to a disturbance complaint. Connors recalled the defendant as being approximately five feet ten inches tall, having very short hair, wearing brown boots, blue dungarees and a blue shirt. He recalled that the defendant stated that he had been drinking scotch. Connors also recalled that the defendant had a distinctive pig-type nose, that the boots made a lot of noise, and that the defendant had been very arrogant in manner.

When Connors heard the victim's description of her assailant he was immediately struck by the very short hair, the pig-type nose and the boots that made a lot of noise. He was also aware that the Greenwich YMCA was located only one hundred yards away from the victim's apartment and that the victim had further related that the rapist had left her apartment at 5 a.m. or shortly thereafter.

Because of the above information Connors came to suspect the defendant and sent an officer to the "Y" to check his whereabouts. The investigation there revealed that the defendant had returned at approximately 5:10 a.m. Connors and a fellow officer then proceeded to the YMCA, arriving there between 6:15 and 6:20 a.m.

Once at the YMCA, Connors with his partner, Officer William Carroll, and Sergeant Rocco Powell procured a passkey and went to the defendant's room, number 308. There they knocked on the door and the defend-

ant answered almost immediately, asking, "[w]ho is there?" Powell responded that it was the police and that they wanted to talk to him about an incident. The defendant answered that he was not dressed and would be a couple of minutes. Within fifteen seconds the officers heard a window being raised. The YMCA had old-fashioned windows with chains and sash weights that made a distinct sound when raised. The officers were familiar with the sound from previous investigations at the "Y."

The officers were also aware that immediately outside the window was a ledge twelve to eighteen inches wide that could provide access to either a fire escape or another room. The temperature outside at that time was below freezing. On hearing the window open, the officers made entry into the room with the passkey. The room was dark. By means of flashlights, they observed the defendant standing partially dressed in the center of the room approximately five to ten feet from the window and facing it. Connors observed fresh scratch marks on the defendant's lower back and also saw the clothing the defendant had been wearing earlier in the evening. He also saw two pairs of boots, one with wooden heels. There was also a partially consumed bottle of scotch on the table.

The fourth amendment to the constitution of the United States provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." A similar provision is contained in article first, § 7 of the constitution of

Connecticut.[1] "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton* v. *New York*, 445 U.S. 573, 586, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980). Absent exigent circumstances the threshold of a person's home may not reasonably be crossed without a warrant. Id., 590; *State* v. *Ruth*, 181 Conn. 187, 193, 435 A.2d 3 (1980). The defendant challenges his arrest without a warrant in this case because of the absence of probable cause and of exigent circumstances. Although the arrest in this case occurred before *Payton* v. *New York*, supra, was decided, because *Payton* has been held to apply to any convictions not finalized as of the decision's date; *United States* v. *Johnson*, 457 U.S. 537, 562, 102 S. Ct. 2579, 73 L. Ed. 2d 202 (1982); the defendant's challenge is properly before us.

## A

### Probable Cause

To justify an arrest it must appear that the arresting officer had reasonable grounds to believe that a felony had been committed; *State* v. *Hoffler*, 174 Conn. 452, 460, 389 A.2d 1257 (1978); and that the person arrested committed it. General Statutes (Rev. to 1979) § 6-49; *State* v. *Acquin*, 187 Conn. 647, 656, 448 A.2d 163 (1983); *State* v. *Cobuzzi*, 161 Conn. 371, 376, 288 A.2d 439 (1971), cert. denied, 404 U.S. 1017, 92 S. Ct. 677, 30 L. Ed. 2d 664 (1972). The defendant does not question that a felony had been committed. There was also sufficient information pointing to the defendant as the probable felon. The victim's description of her

---

[1] Article first, § 7 provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

assailant's features, especially his nose, his clothing and his noisy footwear, and the assailant's statement to her that he had been drinking scotch so closely matched the man that Connors had seen some eight hours earlier that he became an immediate suspect. The fact that he lived only 100 yards from the scene of the crime added another piece to the puzzle. The picture became even clearer when it was learned that the defendant had returned to the "Y" about five or ten minutes after the assailant was reported to have left the victim's apartment. Finally, when the defendant, with the knowledge that the police, who were at his door, wanted to question him about an incident, threw open the window in what could reasonably be regarded as an attempt to flee, the police had sufficient reason to believe that they had their man. *State* v. *Middleton,* 170 Conn. 601, 605, 368 A.2d 66 (1976).

## B

### Exigent Circumstances

"The phrase 'exigent circumstances' refers generally to those situations in which law enforcement agents will be unable or unlikely to effectuate an arrest, search or seizure, for which probable cause exists, unless they act swiftly and, without seeking prior judicial authorization." *United States* v. *Campbell,* 581 F.2d 22, 25 (2d Cir. 1978). The parameters of exigent circumstances are neither so well defined nor so sharply delineated that the phrase may be regarded as a free port of entry for all purposes. Circumstances which may be regarded as sufficiently exigent for a warrantless entry into an automobile may not be sufficient for a warrantless entry into a home. Physical entry of the home is the chief evil against which the wording of the fourth amendment is directed. *Warden* v. *Hayden,* 387 U.S. 294, 301, 87 S. Ct. 1642, 18 L. Ed. 2d 782 (1967). "To

be arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the sanctity of the home. This is simply too substantial an invasion to allow without a warrant, at least in the absence of exigent circumstances, even when it is accomplished under statutory authority and when probable cause is clearly present." *United States* v. *Reed,* 572 F.2d 412, 423 (2d Cir.), cert. denied sub nom. *Goldsmith* v. *United States,* 439 U.S. 913, 99 S. Ct. 283, 58 L. Ed. 2d 259 (1978); *State* v. *Ruth,* supra.

Various courts and commentators have addressed, either directly or obliquely, the type of exigency which would justify a warrantless entry into a home or other building. The United States Supreme Court has upheld such entry where it appears that there was a compelling need for official action and no time to secure a warrant. *Michigan* v. *Tyler,* 436 U.S. 499, 509, 98 S. Ct. 1942, 56 L. Ed. 2d 486 (1978) (warrantless entry of burning commercial building); *Warden* v. *Hayden,* supra (warrantless entry of home in hot pursuit of armed robber); *Ker* v. *California,* 374 U.S. 23, 83 S. Ct. 1623, 10 L. Ed. 2d 726 (1963) (warrantless and' unannounced entry of dwelling to prevent imminent destruction of evidence). In *Johnson* v. *United States,* 333 U.S. 10, 68 S. Ct. 367, 92 L. Ed. 436 (1948), the court also recognized the flight or likely flight of a suspect as coming under the rubric of exigent circumstances. The three general categories which the court has identified as emergency situations are those involving (1) danger to human life, (2) destruction of evidence and (3) flight of a suspect.

We have discussed the issue of exigent circumstances on a number of occasions. In *State* v. *Krause,* 163 Conn. 76, 301 A.2d 234 (1972), we stated (p. 81): "The United States Supreme Court has repeatedly emphasized that mere convenience or saving of time will not excuse the

failure to obtain a warrant. Some element of emergency must exist which would render a search ineffective if delayed by the time necessary to get a warrant." In *State* v. *Januszewski,* 182 Conn. 142, 152, 438 A.2d 679 (1980), we observed that resort to the judicial process will not be required of law enforcement officers "where exigent circumstances exist that make the procurement of a search warrant unreasonable in light of the dangers involved . . . ." And in *State* v. *Schonagel,* 189 Conn. 752, 459 A.2d 106 (1983), we noted (p. 762) that although the imminent removal of property from the searched premises was a distinct possibility, "that possibility does not suffice to establish that there was then an emergency 'which would render a search ineffective if delayed by the time necessary to get a warrant.' *State* v. *Krause,* supra, 81." We also noted in that case (p. 763) that "[w]hen there are reasonable alternatives to a warrantless search, the state has not satisfied its burden of proving exigent circumstances." Although we have mentioned those circumstances which would qualify as exigent, viz. danger to life, destruction of evidence, escape of suspect, and some which would not so qualify, viz. possible removing of property, inconvenience in obtaining a warrant, we have not had occasion to formulate a test for determining whether a given set of circumstances is exigent.

*Dorman* v. *United States,* 435 F.2d 385 (D.C. Cir. 1970), has enumerated a number of factors to be considered in reaching a conclusion of exigency. These are (1) that a grave offense is involved, particularly one that is a crime of violence; (2) that the suspect is reasonably believed to be armed; (3) that there is a clear showing of probable cause; (4) that there is strong reason to believe the suspect is in the premises being entered; (5) that there is a likelihood that the suspect will escape if not swiftly apprehended; (6) that the entry, though

not consented to, is made peaceably, although forcible entry may be justified in some instances. Another factor to be considered is (7) the time of entry. Id., 392–93. The latter factor may cut both ways. A night entry may, on the one hand, underscore the impracticability of securing a warrant and, at the same time, raise particular concern about its reasonableness.

Applying the *Dorman* analysis to the facts of this case, we might well conclude that exigent circumstances were present. The crime was very grave and involved at the least the threat of violence. The victim was led to believe that her assailant was armed even though she did not observe a weapon. On the totality of facts known to the police at the time of entry, probable cause was clear. The police had strong reason to believe that the suspect was in the room being entered—he, in fact, acknowledged his presence. There was every likelihood that the defendant would escape unless he was deterred by swift police action. The entry, made with a passkey, though nonconsensual, was peaceable. The entry was made about 6:30 in the morning. Whether the police could have obtained a warrant at that time from an available judge is not known. What is rather obvious, however, is that at the point when the police became aware of the possibility of flight it would have been extremely difficult to have secured the building against the possibility of escape with only two police officers while a third went to locate an available magistrate. Weighing all of the factors, we are persuaded that the *Dorman* test has been satisfied. See *Vance v. North Carolina,* 432 F.2d 984, 991 (4th Cir. 1970).

While the *Dorman* criteria have their supporters; see cases cited in Donnino & Girese, "Exigent Circumstances for a Warrantless Home Arrest," 45 Alb. L. Rev. 90, 100 (1980); other approaches have been sug-

gested. The United States Court of Appeals for the First Circuit, while acknowledging the value of the *Dorman* analysis, suggests that it is not to be used as a pass or fail checklist for determining exigency since the ultimate test is whether there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant. *United States* v. *Adams,* 621 F.2d 41, 44 (1st Cir. 1980). Donnino and Girese suggest another variant: "Given probable cause to arrest and a reasonable belief that the suspect is in his home, exigent circumstances for a warrantless and nonconsensual entry into a suspect's home to effect this arrest exist when a reasonably prudent man in the circumstances would be warranted in the belief that delay incident to securing the warrant would pose a significant risk of danger to life or property, of the escape of the suspect, or of the destruction of evidence." Donnino & Girese, supra, 114.

Professor La Fave points out that the *Dorman* rule presents a number of practical problems. He suggests that the *Dorman* approach is too sophisticated to be applied with a fair degree of consistency by well-intentioned police officers, in that it requires them to make on-the-spot decisions by a complicated weighing and balancing of a multitude of imprecise factors. 2 La Fave, Search and Seizure § 6.1, p. 390. As an example he cites *United States* v. *Lindsay,* 506 F.2d 166 (D.C. Cir. 1974), wherein the court, after evaluating all of the pertinent circumstances, concluded that the first, second and sixth *Dorman* factors were present, that the third and fourth factors were not present, that the fifth factor could go either way and that the seventh factor was a washout.

La Fave, while acknowledging that a more workable yet fair warrantless entry standard than *Dorman* is not readily apparent, nevertheless, would draw a distinc-

tion between the "planned" arrest and the arrest which is made in the course of an ongoing investigation in the field. La Fave, supra, 391. He defines a "planned" arrest as "one which is made after a criminal investigation has been fully completed at another location and the police make a deliberate decision to go to a certain place, either the arrestee's home or some other premises where he is believed to be, in order to take him into custody." In the "planned" arrest situation he suggests that any claimed exigent circumstances which may arise thereafter are foreseeable and therefore would not justify a warrantless entry unless the exigent circumstances are present before the police go into the field to make the arrest. On the other hand, he would not fault the police for not having an arrest warrant when the occasion for an arrest arises while the police are already out in the field investigating the prior or ongoing conduct which is the basis for the arrest.

Arguably this case comes within La Fave's definition of a "planned arrest" in that the police demonstrated their intention to arrest the defendant by obtaining a passkey before going to his room. Even so, there is no evidence that the police created the later emergency. Despite La Fave's contrary assumptions the police were not bound to foresee the exigency of an attempted escape. A planned arrest is not the fraternal twin of a police created emergency. The latter situation might have been present had the defendant attempted to flee in response to a warrantless unannounced police entry. The sequence here was quite different. The police testified that they heard the window being raised after they knocked on the defendant's door and announced their purpose. They further testified that upon entry they saw the defendant standing not too far away from an open window. The defendant does

not dispute that his window was open and that at that time the temperature outside was below freezing. These unchallenged facts would reasonably support the police version of what occurred after they announced their presence and would also tend to establish the reasonableness of their belief that unless they moved quickly they might lose their quarry.

The Supreme Court of Appeals of West Virginia has announced a test that it regards as being more strict and more precise than any of the above. "The test of exigent circumstances for the making of an arrest for a felony without a warrant in West Virginia is whether, under the totality of the circumstances, the police had reasonable grounds to believe that if an immediate arrest were not made, the accused would be able to destroy evidence, flee or otherwise avoid capture, or might, during the time necessary to procure a warrant, endanger the safety or property of others. This is an objective test; its preeminent criterion is what a *reasonable,* well-trained police officer would believe, not what the arresting officer actually did believe." (Footnote omitted, emphasis in original.) *State* v. *Canby,* 252 S.E.2d 164, 167 (W. Va. 1979). *Canby* further cautions that unnecessary police-created exigencies are not legitimate exceptions to the warrant requirement. Id.

The *Canby* rule has much to commend it. It enforces the mandate of the fourth amendment by protecting the sanctity of the home. The exception is narrowly drawn to cover cases of real and not contrived emergencies. The exception is limited to the investigation of serious crimes; misdemeanors are excluded. It is precise. It is clear enough so that the home owner or occupant may know the extent of his protection and so that the police may know the limitations of their authority. We have in the past, including the recent past, expressed the view that article first, § 7 of the Con-

necticut constitution provides the same protection as the fourth amendment. *State* v. *Grotton,* 180 Conn. 290, 293n, 429 A.2d 871 (1980); *State* v. *Watson,* 165 Conn. 577, 584, 345 A.2d 532 (1973). *Canby* was decided on the basis of the West Virginia constitution. *State* v. *Canby,* supra, 167 n.2. It is difficult to discern any material difference in substance between the *Canby* necessity for immediate arrest test and the compelling necessity for immediate action rule enunciated in *United States* v. *Adams,* supra. In any event since the *Canby* test closely reflects our latest expression on the kinds of circumstances which would justify a warrantless entry into a building; see *State* v. *Schonagel,* supra, 763; we are disposed to follow it. Applying the *Canby* test, we conclude that under the totality of the circumstances, the police had reasonable grounds to believe that if an immediate arrest were not made the accused would have been able to flee or avoid capture.

The defendant also argues that there was little likelihood of his flight because evidence would have demonstrated that the chances of success were small. The defendant's argument misses the mark because it is based on an erroneous assumption that in assessing an emergency a policeman must be prescient. If, applying objective criteria, the police reasonably believed that the defendant would flee, they were entitled to take immediate action on the basis of that belief even if, with the benefit of hindsight, it turned out that they were mistaken.

It follows from the foregoing discussion that given a valid arrest the police had a right to seize as incident thereto any items of evidence on the defendant's person or within the area of his control; *State* v. *McClain,* 171 Conn. 293, 297, 370 A.2d 928 (1976); and any such items in plain view. Id., 298. They could also have used such evidence for the purpose of securing a search

warrant. It is only the information derived from an illegal arrest which may not be used as a basis for procuring a search warrant. *Dotson* v. *Warden,* 175 Conn. 614, 624, 402 A.2d 790 (1978).

## II

### IDENTIFICATION TESTIMONY

The defendant next challenges the show-up identification used by the police and claims that the suggestive procedures tainted not only the out-of-court identification but the in-court identification as well. We examine this challenge in the context of these additional facts: After her initial interview with the police, the victim was taken to the hospital. Sometime between 6 and 6:30 a.m. she was informed by a policewoman that a suspect was being brought in for her to view. She then viewed the defendant through a one-way mirror. She viewed him from the chest up while he was standing with at least one police officer. On viewing the defendant the victim recognized him immediately and without a doubt and became very emotional. He was brought into view a second time to be extra sure and again there was no doubt.

In court, the victim identified the defendant positively, stating that her in-court identification was based on her view of him at the time of the crime and that had she never seen the defendant at the hospital she would still make the same identification in court. On cross-examination, the victim testified that the hospital confrontation confirmed to her who it was, that she could not truthfully maintain that the hospital confrontation was of no assistance and yet she could have gotten along without it.

In front of the jury the victim added the following: that she was a college graduate and a business reporter

for a newspaper. She stated that the walls and ceiling of her bedroom were white, that the floor covering was off-white and that the digital clock was rather bright, enabling her to see forms and shapes and closeups though not perhaps sufficient for reading.

The trial record also reflects that at the time of the complainant's in-court identification the defendant had added a moustache and beard which he had not worn at the time of the crime and hospital identification. In the course of the trial the victim had an opportunity to hear the defendant speak out of turn and was able to identify the voice as that of the rapist.

There are three subordinate issues involved in the admissibility of the identification evidence: (1) whether the out-of-court confrontation was unnecessarily suggestive; (2) if so, whether it was so corruptive as to taint the identification; (3) if the out-of-court identification was tainted, did the taint spill over to the in-court identification.

The show-up or "one-to-one confrontation . . . [is] inherently and significantly suggestive; *State* v. *Middleton,* 170 Conn. 601, 608, 368 A.2d 66 (1976); because it conveys the message that the police have reason to believe the suspect guilty. *State* v. *Willin,* 177 Conn. 248, 251, 413 A.2d 829 (1979)." *State* v. *Maturo,* 188 Conn. 591, 595–96, 452 A.2d 642 (1982). The state concedes that by its very nature the show-up in this case was suggestive, but asserts that it was not unnecessarily so, claiming with some plausibility that at that hour of the morning (6:30 a.m.), so soon after the assailant left the crime scene, allowing the victim to test her recollection while her memory was still fresh justified confrontation even if the situation was suggestive. Cf. *State* v. *Hamele,* 188 Conn. 372, 377, 449 A.2d 1020 (1982). While we are not prepared

to agree with the state's characterization of the show-up as one undertaken under exigent circumstances, we are satisfied that even if it is assumed that the show-up was unnecessarily suggestive, under the totality of the circumstances the complainant's identification of the defendant as her assailant was reliable. *Manson* v. *Brathwaite,* 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); *State* v. *Hamele,* supra, 378.

The victim had her assailant under close observation for a half hour during her four hour ordeal; her description of her assailant accurately described the defendant, so much so that Connors, upon hearing it, immediately responded that he thought he knew who it was, namely the man (the defendant) he had picked up earlier that night; the victim positively identified the defendant without hesitation, upon the initial confrontation and also when she was asked to take a second look to be absolutely certain there was no mistake; and finally, the elapsed time of approximately one hour and a half between the offense and the identification was short.

One additional factor to be noted is the victim herself. At the outset of her four hour ordeal she was confronted with what appeared to her to be a wild man, who was knocking over her lamp, hurling obscenities, and threatening her with bodily harm. Despite being subjected to unspeakable indignities she managed to calm her assailant down to the point where she no longer feared for her life. Later when she was interviewed by the police she remained poised and rational. It was only when she first viewed the defendant through a one-way mirror that she broke down and cried. Taking all these factors into account, the trial court was justified in denying the defendant's motion to suppress the victim's out-of-court identification.

At the trial, which occurred eight months after the offense, the victim was again positive in her identification. She stated that her identification was based on her recollection of the incident and that the show-up was not necessary for her to make an identification although it did confirm her observations. On cross-examination when asked whether the show-up was of any assistance in making the in-court identification she responded:

"A. I don't see how you can [say] it wasn't and be truthful.

"Q. So it was?

"A. And yet, it wasn't. I could have gotten along without it."

The defendant submits that because of the foregoing the state had failed to establish the untainted character of the in-court identification. The defendant's submission is based on a faulty premise. In the absence of questionable action by law enforcement officials there are no special constitutional rules applicable to in-court identification testimony. Such testimony is subject to challenge in two situations, neither of which applies here: (1) where improper pretrial corporeal identification occurs at or after the initiation of adversary judicial criminal proceedings; *Kirby* v. *Illinois,* 406 U.S. 682, 690, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972); *Gilbert* v. *California,* 388 U.S. 263, 272, 87 S. Ct. 1951, 18 L. Ed. 2d 1178 (1967); *United States* v. *Wade,* 388 U.S. 218, 240, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967); *State* v. *Lee,* 177 Conn. 335, 339, 417 A.2d 354 (1979); and (2) where out-of-court identification has occurred under conditions which are unnecessarily suggestive and conducive to irreparably mistaken identification. *Manson* v. *Brathwaite,* supra, 114; *Neil* v. *Biggers,* 409 U.S. 188, 198, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972); *Foster* v. *California,* 394 U.S. 440, 442, 89 S. Ct. 1127, 22 L.

Ed. 2d 402 (1969); *State* v. *Gordon,* 185 Conn. 402, 415, 441 A.2d 119 (1981), cert. denied, 455 U.S. 989, 102 S. Ct. 1612, 71 L. Ed. 2d 848 (1982). In either of the above situations the burden is on the state to establish by clear and convincing evidence that the in-court identification is based upon the witness' independent recollection. *State* v. *Lee,* supra, 340.

This case, which involved a pretrial show-up, requires a two-pronged due process inquiry; first, whether the identification procedure was unnecessarily suggestive and second, if it is found to be so, whether under the totality of circumstances the pretrial identification was nevertheless reliable. *State* v. *Hamele,* supra, 376; *State* v. *Theriault,* 182 Conn. 366, 371–72, 438 A.2d 432 (1980). The hospital show-up was not only suggestive, it was unnecessarily so. There is no showing by the state of a compelling need for an immediate one-to-one confrontation, either because of the physical condition of the victim; *Stovall* v. *Denno,* 388 U.S. 293, 302, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967); or because the absence of a positive identification at the scene would permit the release of an innocent party and allow the police to resume their investigation with a minimum of delay; *State* v. *Hamele,* supra, 377; or because a line-up procedure was impractical under the circumstances. See *State* v. *Theriault,* supra, 373. Nonetheless, because under the totality of circumstances the out-of-court identification measured up to due process standards of reliability it was not tainted. Although the in-court identification could stand on its own in any event, in the absence of a tainted pretrial identification the state was under no constitutional restraints to establish an independent basis for it.

There is no error.

In this opinion the other judges concurred.