[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE DEFENDANT'S AMENDED MOTION TO SUPPRESS EVIDENCE
In an amended motion to suppress, the defendant claims that a bullet found on his person and a subsequent statement that he gave to the police are products of an illegal arrest. Suppression is requested pursuant to the 4th, 5th and 14th Amendments to the Constitution of the United States and Article First 7, 8 and 9
of the Constitution of Connecticut. Irrespective of the legality of the arrest, the defendant also contends that his written statement must be suppressed because it was not voluntarily made.
It is undisputed that the defendant was arrested without a warrant in the early morning of August 6, 1991 inside of his dwelling and that incident to the arrest he was patted down and a bullet was found in the rear pocket of his pants. It is also undisputed that later in the morning of August 6, 1991, the defendant made a written statement at the Waterbury Police Department.
The State has the burden to prove the legality of the arrest, and if the arrest is found to have been illegal, any attenuation between it and the evidence the State proposes to introduce, as well as the voluntariness of the statement. For the arrest, the State can satisfy its burden only by showing probable cause together with proof demonstrating the existence of recognized exceptions to the warrant clause[1] such as exigency or consent. State v. Zindros, 189 Conn. 228, 237 (1983). And for the statement, the State must establish its voluntary nature by a fair preponderance of the evidence. State v. Kane, 218 Conn. 151, 160
(1991).
Probable cause exists when there are facts and circumstances within the collective knowledge of a law enforcement agency and of which agency members have reasonably trustworthy information to CT Page 2405 warrant a reasonable person's belief that a crime has been committed. And that the person whose arrest is sought has committed the crime. State v. Magnotti, 198 Conn. 209, 213
(1985); State v. Kaplan, 20 Conn. App. 183, 186 (1989).
The police were at the scene of the crime on August 5, 1991, and before the defendant was arrested, Joanne B. and Jose V., two juveniles, and Vince Hancock had each given a statement[2] to a Waterbury detective. These statements, incorporated herein by reference, especially that of Hancock, greatly increased the information of the police as to the circumstances of the crime and the alleged perpetrator of the shooting. The "totality of the circumstances" test for probable cause first set forth in Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) and adopted by our Supreme Court in State v. Barton, 219 Conn. 529,544 (1991) was satisfied for robbery in the first degree and a conspiracy to commit robbery, the crimes for which the defendant was arrested.
In State v. Brosnan, 221 Conn. 788, 806 (1992) our Supreme Court reiterated what the Supreme Court of the United States had said about the sanctity of the home in Payton v. New York,445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). For entry by the police into someone's dwelling, a warrant is needed even where probable cause is clearly present unless an exception to the warrant requirement applies. Here the exceptions claimed are exigent circumstances and consent. The court has made separate findings as to each.
 A.
Both parties agree that in State v. Guertin, 190 Conn. 440
(1983), our Supreme Court followed a test for the presence of exigent circumstances that the Supreme Court of Appeals of West Virginia had announced in State v. Canby, 252 S.E.2d 164, 167
(W.Va. 1979). Under the Canby test totality of the circumstances must give the police "reasonable grounds to believe that if an immediate arrest were not made, the accused would be able to destroy evidence, flee or otherwise avoid capture, or might, during the time necessary to procure a warrant endanger the safety or property of others." This is an objective test; its preeminent criterion is what a "reasonable, well-trained officer would believe, not what the arresting officer actually did believe." State v. Guertin, supra at 443. CT Page 2406
Guertin, supra at 449-50 also refers to Dorman v. United States, 453 F.2d 385, 392-93 (D.C. Cir. 1970) wherein the following seven factors are listed for consideration in determining whether an exigency existed: "(1) that a grave offense is involved, particularly one that is a crime of violence; (2) that the suspect is reasonably believed to be armed; (3) that there is a clear showing of probable cause; (4) that there is strong reason to believe the suspect is in the premises; (5) that there is a likelihood that the suspect will escape if not swiftly apprehended; (6) that the entry, though not consented to, is made peaceably although forcible entry may be justified in some instances; (7) the time of the entry. As noted in 2 LaFave, Search and Seizure A. Treatise on the Fourth Amendment (2d ed.) 6.1(f) pp. 595-606 the Dorman criteria has both supporters and detractors. What is important to recognize is that no one exclusive test exists for determining the existence of an exigency and that all of the factors need not be established for a court to decide that exigent circumstances were Present. United States v. Standridge, 810 F.2d 1034, 1037 (11th Cir. 1987); United States v. Lindsay, 506 F.2d 166, 171, 172 (1974).
In his statement Vince Hancock relates how after the "Chinese guy" was shot he and Lennis ran to Jerrod's[3] house where minutes later they were met by Jerrick and Jerrod. At the time Jerrod was still holding the gun and was talking about wiping his prints off of it. Jerrod put the gun in the woods near his house. Jerrod then took the telephone numbers of the others and told them not to say anything to the cops. The group split up with individuals going to their own houses. When Hancock arrived home, he received a call from Jerrod who threatened him again not to tell anyone what they had done or Jerrod would shoot him.
Applying the Dorman criteria to the paraphrased portion of Hancock's statement demonstrates that before the detectives entered the defendant's house at approximately 2:00 a.m. on August 6, 1992, they had, from a confederate's statement, been given reasonable grounds to believe in the existence of items 1, 2, 3 and 4. Item 6 was also satisfied. Whether the entry of the detectives was accomplished consensually is discussed later. There is no dispute however that the entry was peaceable. With respect to item 7, judicial notice is taken of the fact that at 2:00 a.m. a warrant would have been difficult to obtain. Detectives Demers and Jones did testify that they believed the defendant would flee once he learned that Hancock was in police custody. But, whereas such a belief might be reasonably CT Page 2407 suspected, the court finds that before the defendant's house was entered, the belief of the police in the existence of item 5 was not supported by articulable facts.
The existence of all but one item of the Dorman criteria supports a finding of exigent circumstances. Also the threat to Vince Hancock and the defendant's apparent ability to carry out his threat, in and of itself, seemingly provides a situation of exigency under the disjunctively worded Canby test approved in State v. Guertin, supra. Moreover the occasion for the defendant's arrest rose during the investigation of the crime as distinguished from a "planned" arrest made after an investigation had been fully completed. Pointed out in 2 LaFave, Op. Cit. 6.1(f) pp. 601-02 n. 171, is that where the arrest stems from on-going investigatory activity, "There should be a far greater reluctance to fault the police for not having an arrest warrant." Under the circumstances of this case the existence of exigent circumstances has been proven.
 B.
A warrantless entry into a person's home is not unreasonable under the Fourth Amendment or Article First 7 of the State Constitution if a person with authority to do so has freely consented. State v. Reagan, 209 Conn. 1, 7 (1988). Whether a consent to an entry was given voluntarily is a question of fact to be determined from a totality of all of the circumstances. The State has the burden of proof but on the issue no one factor is controlling. The State must affirmatively establish that the consent was voluntary in fact and was not the product of coercion or acquiescence to a claim of lawful authority. State v. Jones,193 Conn. 70, 78-79 (1984); State v. Cobbs, 7 Conn. App. 656, 659
(1986). What the State does not have to prove is that the consent was preceded by a warning of Fourth Amendment rights or that the party consenting had knowledge of such rights. Schneckloth v. Bustamonte, 412 U.S. 218, 246, 93 S.Ct. 2041, 36 L.Ed.2d 854
(1973); State v. Annonymous (1981-1), 37 Conn. Sup. 755, 760
(App. Sess. Sup. Ct. 1981).
On the issue of consent, irreconcilable differences existed between the testimony of the State's witnesses, Detectives Demers, Jones and Egan and the testimony from the defense witnesses, the defendant and his mother. As the arbiter of the credibility of witnesses, State v. Madera, 210 Conn. 22, 37 (1989), the court finds the facts set forth below. CT Page 2408
Vince Hancock told the detectives that the defendant might be at home. On the basis of the information received, the detectives drove in two unmarked vehicles to 278 Austin Road, a row of attached one-family houses. The defendant lives in no. 6, the last unit on the right. The detectives arrived at approximately 2:00 a.m. Detectives Demers and Egan went to the front door; Detective Jones went around to the side door. A fourth detective stayed in one of the unmarked cars with Vince Hancock.
Detective Demers knocked on the front door more than twice. When the door was opened by Catherine Ellis the defendant's mother, Detectives Demers and Egan identified themselves and showed their badges. While standing outside the doorway, Demers informed Catherine Ellis that they were there to arrest the defendant who they believed had been involved in a robbery and shooting. No guns were displayed, no force was used and no threats were uttered. The detectives did not say that if entry were denied, they would be back with a warrant. On her part, Catherine Ellis did not tell the detectives not to enter nor did she signify her opposition in any other way. She appeared to be nervous but she pointed to the upstairs where the bedrooms are located. Detectives Demers and Egan went up the stairs to the defendant's bedroom which was the first one on the right. Demers was holding a flashlight. Egan by this time had drawn his gun. Detective Jones, who had entered the apartment after the other two, remained downstairs and spoke with Catherine Ellis.
In the bedroom, the detectives identified themselves. Detective Egan asked the defendant, who was lying on the bed, if he were Gerrod Ellis. When the defendant answered "yes," Egan told him to stand up as he was under arrest for robbery in the first degree and conspiracy to commit robbery. Egan's recollection was that the defendant was wearing pants and a shirt and that he placed sneakers on the defendant's feet. Demers recalled that the defendant put on his pants and shirt which were close to the bed. The defendant was handcuffed with his hands placed in front of his body. Detective Egan led the defendant out of the house to a place alongside one of the two unmarked police cars.
When the defendant was arrested, he was seventeen years old and a high school student. He lived with his mother who leased their home and he did not contribute toward the rent. The State has proven that the defendant's arrest resulted from the consent CT Page 2409 of Catherine Ellis to the search of the house. Consent to search can be given by a third person who possesses common authority or other sufficient relationship to the premises sought to be inspected. United States v. Matlock, 415 U.S. 164, 171,94 S.Ct. 988, 39 L.Ed.2d 242 (1974). See State v. Cardona, 6 Conn. App. 124,134 (1986). A parent with a legal interest in premises can transfer to the police the right to enter and search the entire premises including that portion, such as the defendant's bedroom, that the parent has designated for use by the child. Vanderberg v. Superior Court, 8 Cal.App.3d 1048, 1053, 87 Cal.Rptr. 876,879 1970).[4]
 II.
Before the defendant was taken from the house, Detective Demers informed Catherine Ellis that the defendant would be at the Waterbury Police Department and she could come down. Outside of the house and near the police car, Demers read the defendant his rights from a "Miranda" card. The defendant was asked if he understood his rights and answered "yes." In May of 1991, the rights were read to the defendant on a misdemeanor arrest and he had also received them one time as a juvenile.
Demers also patted down the defendant. In a rear pocket Demers felt a hard object that, when recovered, was a .22 caliber bullet.[5] Without any questioning from Demers or the other detectives, the defendant volunteered that he had gotten the bullet from Jerrid F. who also had the gun. At this juncture there were no Miranda problems because the defendant, although in custody, was not being interrogated. Rhode Island v. Innis,446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); State v. Rosado, 218 Conn. 239, 253 (1991).
The detectives then asked where Jerrid F. lived. The defendant's response was to point his manacled hands toward the unit at the left end of the row of attached houses. Although the question and nonverbal answer were within the ambit of Miranda, see State v. Rosado, supra, the defendant's attack is directed to what occurred "downtown" at the police station where he gave a formal statement.
The proximity of Jerrid F's. house prompted a delay in the transportation and processing of the defendant. Detectives Demers and Egan went there while Detective Nardozzi stayed with the defendant. The defendant observed Jerrid F. being placed in a CT Page 2410 police car and his mother getting into her own car. The result was that Catherine Ellis and the persons she alerted, her friend Christian Hadley and the defendant's father Ronald Davis, arrived at the police station before the defendant was brought in.
In the holding cell at the detective bureau, Sergeant Coyle read the "Miranda" rights to the defendant and asked if he would be willing to make a statement concerning the robbery on Stonefield Drive. The defendant expressed willingness so Coyle took him from the holding cell and brought him to his desk. The rights were read again by Coyle and the defendant read them aloud at Coyle's direction. Then the defendant, as instructed by Coyle, initialed each right in the appropriate space. The written form read by Sergeant Coyle and the defendant and then initialed by the defendant contains an express waiver of all of the enumerated rights.
The defendant's statement[6] lists 3:30 a.m. on August 6, 1991 as its starting time. Sergeant Coyle is a slow typist so he had the defendant repeat what he was saying several times. When the two-page statement was finished, Coyle had the defendant read it to himself and then aloud. Coyle asked the defendant if he wished to make any corrections. The defendant said "no". On August 6, 1991, the defendant possessed excellent reading skills.
The statement was signed by the defendant before Sergeant Apicella who acted as a notary. On each page before the signature line are the following printed words: "I have read this statement consisting of 2 pages. The facts therein contained are true and correct and I have given the above statement of my own free will after my constitutional right (sic) have been explained to me."
A picture far different from Sergeant Coyle's testimony was presented by the defendant. He testified that when brought into the police station he asked to see a lawyer and his mother but Detectives Demers, Jones and Egan said you can see your mother and a lawyer after you give a statement.[7] He said that Coyle did not read the rights to him but only told him to initial them. When he answered some of Coyle's questions he described Coyle as telling him "you can't say that." In sum, the defendant claimed that he thought seeing his mother and consulting with a lawyer depended upon his making and signing the statement that the police wanted. He admitted that after his statement was signed he did not renew his requests for either his mother or a lawyer. CT Page 2411
No one informed Sergeant Coyle that Catherine Ellis had been told that she could come to the police station or that she and the defendant's father were waiting in the vestibule. Coyle did not ask if the defendant wished to see either parent. Coyle did notify the defendant of his right to remain silent and his right to an attorney as part of the prescribed Miranda procedure.
A minor, over the age of sixteen, can validly waive his Miranda rights and make a voluntary statement without the presence of a parent. State v. Whitaker, 215 Conn. 739, 747 (1991); cert. denied 402 U.S. 946, 91 S.Ct. 1037, 29 L.Ed.2d 115 (1971). A request for an attorney of course stands on a different footing. Upon a request for counsel, the police must cease all questioning. If a request is ambiguous, the interrogating officer must clarify a suspect's wishes before questioning can resume. State v. Whitaker, supra at 750; State v. Birch, 219 Conn. 743, 749 (1991). A minor's desire to talk to a parent becomes part of the Miranda doctrine only if the minor lets it be known that he wants to ask the parent to engage an attorney for him. State v. Whitaker, supra, 749-50.
If the defendant's conversation with Sergeant Coyle accorded with the defendant's testimony in court, his statement would be inadmissible on the dual grounds of Miranda and involuntariness. But once again the credibility of witnesses becomes important. State v. Madera, supra. The court does not believe the defendant's version of what transpired at the Waterbury Police Department on the morning of August 6, 1991. The State has sustained its burdens of proving by a preponderance of the evidence that the defendant knowingly and intelligently waived his Miranda rights, State v. Barrett, 205 Conn. 437, 439 (1987), and that on the totality of the circumstances, the defendant's statement was voluntary. State v. Usry, 205 Conn. 298, 309
(1987).
 III.
For the reasons stated herein, the amended motion to suppress is denied.
BARNETT, J.