Filed 6/11/13

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>v.<br><br>LORENZO BARNES,<br><br>   Defendant and Appellant. | A135131<br><br>(San Francisco City & County<br>Super. Ct. No. 214120) |

Following the denial of his motion to suppress evidence pursuant to Penal Code section 1538.5, defendant Lorenzo Barnes entered pleas of guilty to two counts of second degree robbery while personally armed with a firearm, and one count of being a past-convicted felon in possession of a firearm. Defendant was sentenced to state prison for an aggregate term of 13 years and eight months. The sole issue he presents for decision on this appeal is whether the Fourth Amendment is violated when police use the Global Positioning System (GPS) to locate a stolen cell phone and detain the thief. Our answer is the same as that of the trial court—there is no Fourth Amendment violation when the information generated by the GPS, with the owner's consent, is only a part of the objective reasons leading to the decision to detain. Accordingly, there was no error in the denial of defendant's suppression motion, and we affirm the judgment of his conviction.

## BACKGROUND

The salient details are not in dispute.

Shortly after midnight on November 5, 2009, Charles Parce and Carolyn Fey were walking near Fort Mason in San Francisco when a Black male approached them, brandished a handgun, and demanded their belongs. Parce handed over his wallet, but

Fey ran across the street and threw her turquoise Prada handbag under a parked car. The gunman retrieved the purse and fled on foot. Parce and Fey described the gunman as wearing blue jeans, a white T-shirt underneath a black hooded sweatshirt, and white shoes. Fey told police that her wallet and a "Palm Pre smart phone" were in her handbag.

Before Parce and Fey were taken to a police station, Fey advised the officers that her cell phone "had GPS on it." Officer Zeltser "contacted Sprint PCS and spoke to their corporate security people, who stated that if Fey would sign a release form, . . . they would be able to ping the cell phone." "[T]he way they explained it to me was that they would send a signal to the phone . . . they described it as 'pinging it,' that they could then basically find a general location within 15 yards or 15 meters of where the phone was." Sprint faxed the release form to the police station, Fey completed it, and it was then faxed back to Sprint. Zeltser testified that "I asked them to ping the cell phone; they . . . advised me that it was . . . stationary at 16th and Mission Street." This was approximately 45 minutes after the robbery.

Zeltser "turned the phone over to Officer Hamilton" to continue speaking with Sprint, and then he and another officer left to go to "the location to see if we could locate the suspect." En route, Zeltser heard Hamilton report that "the ping was still coming from 16th and Mission," and then "between 16th and 17th and Mission."

Meanwhile, Officers Clifford and Tannenbaum, having received a broadcast as to the first location, observed defendant on foot at 16th and Mission. Zeltser testified that Tannenbaum reported being at 15th and Mission, and that "a person matching the description[1] . . . had gotten into a vehicle and was driving down Mission Street." "As the vehicle was stopped at a red light at 15th and Mission," "[w]e repinged the cell phone and it came back 15th and Mission; at which point I . . . raced over to assist him, because he advised that he was going to initiate a traffic stop." Officers Clifford and Tannenbaum

---

[1] Officer Geraldo, who first took the description of the robber from Fey and Pearce, testified that they did not say anything about the robber's hairstyle. However, Officer Clifford testified that the description radioed to him include "the texture of the [suspect's] hair."

were "updated" with the results of the continued pinging, i.e., that "the ping was moving towards the north."

Officer Zeltser arrived on the scene, which was at 13th and Mission, just as Tannenbaum had "initiated the traffic stop" and "was contacting Mr. Barnes." Zeltser testified: "As I approached, I had my flashlight out; I looked in the rear seat of the vehicle and I noticed a purse that matched the description [of the one] that was taken in the robbery" on the rear seat of the vehicle that defendant was driving. On the front seat Zeltser saw the cell phone. This was approximately an hour after the robbery.

Officer Clifford testified to what happened once the stop was made: "[W]e asked him . . . if he was on probation . . . [¶] And then there was a comment that was made by the person driving the vehicle. I think he said something about a gun. And then my partner asked him out of the car. And that's when I walked around and we both immediately noticed a gun in his waistband." Clifford also noticed the handbag, which he vividly described as "one of those purses you probably [could] see from a mile away, it's so bright, the color."

Fey was brought to the scene and identified defendant as the robber. Later, take back to the police station, she identified the purse and cell phone as hers.

When defendant argued the suppression motion in May 2011, he challenged only the legality of "the initial stop." Without making a formal *Kelley-Frye* objection,[2] defendant pointed out "there is no evidence before the Court that these officers have utilized this technique for location determination," the prosecution having offered no evidence as to the reliability of this process. And, in the absence of such evidence, the prosecution was merely "relying on . . . a hunch" by the officers, and "they base their stop on that." Defendant analogized this idea to "the reliability of a confidential

---

[2] Named after *People v. Kelly* (1976) 17 Cal.3d 24 and *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013, requiring the proponent of a new scientific technique, process, or theory to establish " 'usually by expert testimony,' that the technique is ' "sufficiently established to have gained general acceptance in the particular field to which it belongs." ' " (*People v. Stoll* (1989) 49 Cal.3d 1136, 1155.)

informant. You know, if the informant has on prior occasions supplied information that turned out to be reliable, I believe the law allows the Court to consider that in determining whether the officer's conduct was reasonable."

Citing *United States v. Maynard* (D.C. Cir. 2010) 615 F.3d 544, defendant insisted that 'the language . . . is clear. [¶] There is concern that when the police use this type of technology, that they are violating a reasonable expectation of privacy. [¶] So in and of itself, the use of this technology could be found to violate a reasonable expectation of privacy." Defense counsel's argument concluded: "I would submit that there really is not enough evidence to justify the stop of this individual miles away from where the crime occurred based upon the GPS and the clothing description, which could have fit anybody."

The prosecutor responded that "the defense is relying on this *Maynard* case. Well, this is nothing like *Maynard*. In *Maynard*, the police attached a device to the defendant's car and then followed his movements 24 hours a day for four weeks with that device that they had attached. [¶] That's not what happened here. [¶] Here, the defendant, at gunpoint, stole a cell phone from Ms. Fey. He has no expectation of privacy in the location of that stolen cell phone. So the motion to suppress should be denied."

The trial court agreed: "I think Ms. Fey had every right to utilize her phone company to find her phone, and I think that's what happened here. I don't believe that the defendant has a privacy interest in that regard. [¶] I don't think that there was a particular action on the part of the police . . . to intrude on the defendant's privacy. They were in pursuit of a phone that they have consent from the owner of the phone to pursue; so they went to the area where this phone was located. [¶] . . . [¶] I don't feel that there was an unreasonable intrusion . . . [with] . . . the stop of the defendant. [¶] Motion to suppress is denied."

## DISCUSSION
### Defendant's Contentions And The Standard Of Review

During the pendency of this appeal, the *Maynard* decision was reviewed and affirmed by the United States Supreme Court in *United States v. Jones* (2012)

4

565 U.S. __ [132 S.Ct. 945] (*Jones*). In light of *Jones*, which will be discussed later, defendant has reformulated his approach to overturning his conviction. He no longer sees use of GPS technology as a per se violation of the Fourth Amendment. Continuing themes expressed at the suppression hearing, defendant reiterates the issue of "reliability" and the confidential informant analogy. Next, defendant contends that, even assuming the information provided by Sprint was reliable, "it merely established the location of the stolen phone, not the location of the suspected robber." Finally, defendant maintains that without the GPS information, Officers Clifford and Tannenbaum had only "pedestrian facts"—i.e., "the suspect's race, gender and attire"—"which did not support reasonable suspicion for the stop."

We analyze these arguments according to well-established principles.

Evidence obtained from a search or seizure in violation of the Fourth Amendment must be excluded from use at a criminal trial only if required by federal law. (Cal. Const. art. I, § 28, subd. (d); *People v. Camacho* (2000) 23 Cal.4th 824, 829-830.) Because the evidence produced in connection with defendant's suppression motion was not in dispute, the issue on this appeal become a question of law, as to which we conduct an independent review to determine whether the officer's actions were reasonable for purposes of the Fourth Amendment. (*People v. Duren* (1973) 9 Cal.3d 218, 239; *People v. Durant* (2012) 205 Cal.App.4th 57, 62.)

The applicable federal standard is likewise not in dispute: "The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest. [Citations.] Because the 'balance between the public interest and the individual's right to personal security' [citation], tilts in favor of a standard less than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity " 'may be afoot' " [citation]." (*United States v. Arvizu* (2002) 534 U.S. 266, 273.) In making determinations of reasonable suspicion to justify a detention, reviewing courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has

a 'particularized and objective basis' for suspecting wrongdoing. [Citation.] This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might elude an untrained person.' [Citations.] . . . [T]he likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard. [Citation.]" (*Id*. at pp. 273-274.)

### *United States v. Jones*

Jones, a suspected narcotics trafficker, drove his Jeep for 28 days without realizing police had, without benefit of a warrant, attached a GPS device to track the vehicle's movements. "By means of signals from multiple satellites, the device established the vehicle's location within 50 to 100 feet, and communicated that location by cellular phone to a Government computer. It relayed more than 2,000 pages over the 4-week period." (*Jones*, *supra,* 565 U.S. __ [132 S.Ct. 945, 948].) The District of Columbia Circuit Court of Appeals concluded that evidence obtained from the GPS device violated the Fourth Amendment, requiring reversal of Jones's conviction. All nine members of the United States Supreme Court agreed with this result.

Justice Scalia spoke for five justices. His approach is notable for his devotion to the constitutional text, in this case the Fourth Amendment language that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Justice Scalia began his analysis by insisting "It is important to be clear about what occurred in this case: The Government physically occupied private property for the purpose of obtaining information. We have no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted." (*Jones*, *supra,* 565 U.S. __ [132 S.Ct. 945, 949].)

"The text of the Fourth Amendment reflects its close connection to property, since otherwise it would have referred simply to 'the right of the people to be secure against unreasonable searches and seizures'; the phrase 'in their persons, houses, papers, and effects' would have been superfluous. [¶] Consistent with this understanding, our Fourth

6

Amendment jurisprudence was tied to common-law trespass, at least until the latter half of the 20th century." (*Jones*, *supra,* 565 U.S. __ [132 S.Ct. 945, 949-950].) The change came with *Katz v. United States* (1967) 389 U.S. 347, where "we said that 'the Fourth Amendment protects people, not places,' and found a violation in attachment of an eavesdropping device to a public telephone booth. Our later cases have applied the analysis of Justice Harlan's concurrence in that case, which said that a violation occurs when government officers violate a person's 'reasonable expectation of privacy,' [citations]." (*Jones, supra,* 565 U.S. __ [132 S.Ct. 945, 950].) Still, "for most of our history, the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ('persons, houses, papers, and effects') it enumerates. *Katz* did not repudiate that understanding." (*Ibid.*, fn. omitted.)

Justice Scalia explained: "*Katz* did not erode the principle 'that, when the Government *does* engage in physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment. [Citation.] We have embodied that preservation of past rights in our very definition of 'reasonable expectation of privacy' which we have said to be an expectation 'that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." (*Jones*, *supra,* 565 U.S. __ [132 S.Ct. 945, 951].) "[T]he *Katz* reasonable-expectation- of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test." (*Id.* at __, [132 S.Ct. 945, 952].)

There were two concurrences in *Jones*. The first was by Justice Sotomayor, who joined the majority Scalia opinion "because I agree that a search within the meaning of the Fourth Amendment occurs, at a minimum. '[w]here, as here, the Government obtains information by physically intruding on a constitutionally protected area.' " (*Jones*, *supra,* 565 U.S. __ [132 S.Ct. 945, 954] (conc. opn. of Sotomayor, J.).) But she set forth a major caveat. "In cases of electronic or other novel modes of surveillance that do not depend upon a physical invasion on property, the majority opinion's trespassory test may provide little guidance," thus necessitating broadening the scope of a *Katz*-based

approach. (*Id*. at __ [132 S.Ct. 945, 955].) "In cases involving even short-term monitoring, some unique attributes of GPS surveillance relevant to the *Katz* analysis will require particular attention," and Justice Sotomayor would "take . . . attributes of GPS monitoring into account when considering the existence of a reasonable expectation of privacy in the sum of one's public movements." (*Id*. at __ [132 S.Ct. 945, 955-956].)

The second concurrence in *Jones* was by Justice Alito, joined by Justices Ginsburg, Breyer, and Kagan. Justice Alito believed it was "unwise" for the majority to "decide this case based on 18th-century tort law." (*Jones*, *supra,* 565 U.S. __ [132 S.Ct. 945, 957-958] (conc. opn. of Alito, J.).) *Katz* was certainly an improvement, but "the *Katz* test rests on the assumption that this hypothetical reasonable person has a well-developed and stable set of privacy expectations. But technology can change those expectations. Dramatic technological change may lead to periods in which popular expectations are in flux and may ultimately produce significant changes in popular attitudes." (*Id*. at__ [132 S.Ct. 945, 962].)

Cell phone technology was very much on Justice Alito's mind: "[C]ell phones and other wireless devices now permit wireless carriers to track and record the location of users—and as of June 2011, it has been reported, there were more than 322 million wireless devices in use in the United States. For older phones, the accuracy of the location information depends on the density of the tower network, but new 'smart phones,' which are equipped with a GPS device, permit more precise tracking. For example, when a user activates the GPS on such a phone, a provider is able to monitor the phone's location and speed of movement and can then report back real-time traffic conditions after combining ('crowdsourcing') the speed of all such phones on any particular road. Similarly, phone-location-tracking services are offered as 'social' tools, allowing consumers to find (or to avoid) others who enroll in these services. The availability and use of these and other new devices will continue to shape the average person's expectations about the privacy of his or her daily movements." (*Jones*, *supra,* 565 U.S. __ [132 S.Ct. 945, 963] (conc. opn. of Alito, J.).)

Justice Alito noted that because there is was little legislative guidance "regulating the use of GPS tracking technology for law enforcement purposes. The best that we can do in this case is to apply existing Fourth Amendment doctrine and to ask whether the use of GPS tracking in a particular case involved a degree of intrusion that a reasonable person would not have anticipated." (*Jones*, *supra,* 565 U.S. __ [132 S.Ct. 945, 964].) It was the extended duration of the use of the tracking device that persuaded Justice Alito that an illegal search had occurred. (*Ibid*.)

Justice Scalia responded to Justice Alito by denying that the majority was shackled to "18th century tort law": "That is a distortion. What we apply is an 18th century guarantee against unreasonable searches, which we believe must provide at a minimum the degree of protection it offered when it was adopted. The concurrence does not share that belief. It would apply *exclusively Katz*'s reasonable-expectation-of-privacy test, even when that eliminates rights that previously existed. [¶] The concurrence faults our approach for 'present[ing] particularly vexing problems' in cases that do not involve the transmission of electronic signals. [Citation.] We entirely fail to understand that point. For unlike the concurrence, which would make *Katz* the *exclusive* test, we do not make trespass the exclusive test. Situations involving merely the transmission of electronic signals without trespass would *remain* subject to *Katz* analysis." (*Jones*, *supra,* 565 U.S. __ [132 S.Ct. 945, 953].)[3]

---

[3] The most recent Fourth Amendment decision shows that the analytical template of *Jones* remains. The issue in *Florida v. Jardines* (2013) 569 U.S. __ [133 S.Ct. 1409] was posed as "whether using a drug-sniffing dog on a homeowner's porch to investigate the contents of the home is a 'search' within the meaning of the Fourth Amendment." (*Id.* at p. __ [133 S.Ct. 1409, 1413].) Five members of the court, again speaking through Justice Scalia, concluded that by bringing the dog on the porch the officers had physically intruded into the curtilage of the home, and thus committed a search of the home. Because of this conclusion, "we need not decide whether the officers' investigation of Jardines' home violated his expectation of privacy under *Katz.*" (*Id.* at p. __ [133 S.Ct. 1409, 1417].) Just like in *Jones*, Justice Alito spoke for four justices, but this time in dissent. He concluded the officers were no different than other members of the public who have "a license to . . . approach the front door of a house and to remain there for a brief time," and thus there was no governmental intrusion. (*Id.* at p. __ [133 S.Ct. 1409,

9

**Analysis**

Although defendant no longer equates police use of GPS technology with a standing violation of the Fourth Amendment, he is still deeply uneasy with what he fears is the onset of an irresistible erosion of personal privacy. Both defendant and the Attorney General have obviously given the matter considerable thought, and the briefs reflect research that has reached into academic journals and unpublished federal decisions.

Because there was no physical trespass or intrusion,[4] the question becomes how defendant fares under "*Katz*'s reasonable-expectation-of-privacy test" because "[s]ituations involving merely the transmission of electronic signals without trespass would *remain* subject to *Katz* analysis." (*Jones*, *supra,* 565 U.S. __ [132 S.Ct. 945, 953].) Put more precisely, did defendant have a legitimate expectation of privacy in the cell phone he had stolen. The answer is an emphatic "No." As stated most baldly by the Ninth Circuit: "The Fourth Amendment does not protect a defendant from a warrantless search of property that he stole, because regardless of whether he expects to maintain privacy in the contents of stolen property, such an expectation of privacy is not one that society is prepared to accept as reasonable." (*United States v. Caymen* (9th Cir. 2005) 404 F.3d 1196, 1200.) The principle enjoys wide acceptance. (*State v. Jackson* (La. 2010) 42 So.3d 368, 372; *State v. Soukharith* (Neb. 1997) 570 N.W.2d 344, 356; *United States v. Tropiano* (2d Cir. 1995) 50 F.3d 157, 161-162 and decisions cited; *United States v. Bailey* (6th Cir. 1980) 628 F.2d 938, 944; *United States v. Soto* (D. Mass. 2011)779 F.Supp.2d 208, 218.)

---

1420] (dis. opn. of Alito, J.).) Nor was there a violation of *Katz*: "A reasonable person understands that odors emanating from a house may be detected from locations that are open to the public, and a reasonable person will not count on the strength of those odors remaining within the range that, while detectable by a dog, cannot be smelled by a human." (*Id*. at p. __ [133 S.Ct. 1409, 1421].)

[4] The only trespass here was committed by defendant who committed it when he took Fey's purse. (See *Jones*, 565 U.S. __ [132 S.Ct. 945, 962] (conc. opn. of Alito, J.) ["Trespass to chattels has traditionally required a physical touching of the property"].)

Twice the Ninth Circuit has held that "a person lacks a reasonable expectation of privacy in the contents of a laptop computer he stole," particularly because "Whatever possessory interest a thief may have, that interest is subordinate to the rights of the owner." (*United States v. Caymen*, *supra*, 404 F.3d 1196, 1200; *United States v. Wong* (9th Cir. 2003) 334 F.3d 831.)  Another Circuit has held post-*Jones* that the sort of 'pinging' found here presents no Fourth Amendment problem when the information used in determining location could have been gained from simple visual surveillance.  (*United States v. Skinner* (6th Cir. 2012) 690 F.3d 772, 777-778 ["While the cell site information aided the police in determining Skinner's location, that same information could have been obtained through visual surveillance. [¶] . . .  Skinner did not have a reasonable expectation of privacy in the location of his cell phone while traveling on public thoroughfares"]; see *United States v. Forest* (6th Cir. 2004) 355 F.3d 942, 951.)

Moreover, Fey, the actual owner of the cell phone—and the only person who could have a legitimate expectation of privacy—had consented to its use by Sprint and the police in apprehending the person who was illegally in possession of the phone. Federal courts have weighed such consent against a criminal defendant's claim of privacy.  (See *United States v. Bruneau* (8th Cir. 1979) 594 F.2d 1190, 1194 [consent by owner of airplane to attach electronic tracking device upheld]; *United States v. Miroyan* (9th Cir. 1978) 577 F.2d 489, 493 [same]; *United States v. Abel* (5th Cir. 1977) 548 F.2d 591, 592 [same].)  And the short duration of the monitoring here would not even bother Justice Alito.  (See *Jones*, 565 U.S. __ [132 S.Ct. 945, 964] (conc. opn. of Alito, J. ["relatively short-term monitoring of a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable"].)

Finally, all of this appears to comport with a California statute that is highly instructive.  In 1998, the Legislature enacted a measure which states "No person or entity in this state shall use an electronic tracking device to determine the location or movement of a person," but then also provides, "This section shall not apply when the registered owner, lesser, or lessee of a vehicle has consented to the use of the electronic tracking device with respect to that vehicle."  (Pen. Code, § 637.7, subds. (a), (b).) It further

11

provides that "This section shall not apply to the lawful use of an electronic tracking device by a law enforcement agency." (*Id.*, subd. (c).) This measure was accompanied with the statement that "The Legislature finds and declares that the right to privacy is fundamental in a free and civilized society and that the increasing use of electronic surveillance devices is eroding personal liberty. The Legislature declares that electronic tracking of a person's location without that person's knowledge violates that person's reasonable expectation of privacy." (Stats. 1998, ch. 449, § 1.) If California is willing to have police and the owner cooperate in tracking a motor vehicle, it seems unlikely state policy would be outraged by such cooperation employed to apprehend armed robbers in possession of stolen property.

Accordingly, we conclude that the use of GPS technology in ascertaining the location of the stolen cell phone, and thus assisting in the locating of defendant was no violation of the Fourth Amendment.

The remainder of defendant's arguments are unavailing.

A single sentence in defendant's opening brief—"the prosecution did not establish that the accuracy of this type of GPS technology is well accepted in the scientific community and the community at large, or that it's pretty accurate"—suggests that defendant may still believe that some aspect of a *Kelly-Frye* (see fn. 2, *ante*) argument can be utilized on this appeal. However, because defendant never objected to the admission of Officer Zeltser's testimony, which was the only evidence on GPS technology received at the suppression hearing, any *Kelly-Frye* claim was not preserved for review. (Evid. Code, § 353, subd. (a); *People v. Ochoa* (1998) 19 Cal.4th 353, 414.)

Citing a number of journals, defendant points out that " 'GPS tracking,' 'triangulation,' and 'pinging' are all distinct methods," and repeats that "at the suppression hearing . . . [no] Sprint employee testified about the precise process used to 'ping' the phone and its accuracy. Nor did the prosecution call a qualified expert witness to explain the technology used in this case or to vouch for its reliability." Again, the only testimony on technology was from Officer Zeltser—and without objection. Attempting

to frame the issue as one of "reliability" is really no more than a challenge to witness credibility (see *People v. Riccardi* (2012) 54 Cal.4th 758, 833; *People v. Hovarter* (2008) 44 Cal.4th 983, 996-997; *Davis v. Alaska* (1974) 415 U.S. 308, 318 ["jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness"]), which is the exclusive province of the trial court hearing the suppression motion. (*People v. Woods* (1999) 21 Cal.4th 668, 673; *People v. Laiwa* (1983) 34 Cal.3d 711, 718.)

Defendant's analogizing the information from Sprint as akin to a tip from "an untested informant whose reliability was not presumed or established" must also fail. Unlike an informant, Sprint did not initiate contact with police. Instead, it was police, with the active assistance of the property owner, who approached Sprint. Defendant argues that "There is no way that the police officers in the Mission District could have verified the reliability of [Sprint's] phone location information until they observed the actual cell phone." These are other oblique efforts by defendant to impeach or discount the use of the GPS technology by the officers here. It is also wrong. The officers could verify the information passed on from Sprint if in the pinged areas the officers encountered a person matching the description provided by the victims.

Equally misplaced is defendant's assertion that even if the information from Sprint is accepted as reliable, "it merely established the location of the stolen phone, not the location of the suspected robber." True, but the officers could certainly infer a reasonable possibility that if they could locate the phone they would also locate the robber. The question for the officers was if they went to the scene reported by Sprint, would they find a male resembling the description provided by the victims? Correlating defendant's observed movements with both the GPS location *and* the victims' description provided Officers Tannenbaum and Clifford with ample reasonable suspicion for a detention. (*United States v. Arvizu*, *supra*, 534 U.S. 266, 273-274.)

13

## DISPOSITION

Our independent review discloses no error in denying defendant's suppression motion, and the judgment of conviction is affirmed.

_____
Richman, J.

We concur:

_____
Kline, P.J.

_____
Haerle, J.

| | |
|---|---|
| Trial Court: | Superior Court of the City and County of San Francisco |
| Trial Judge: | Honorable Jerome T. Benson |
| Attorneys for Defendant and Appellant: | Kathryn Seligman, under appointment by the Court of Appeal. |
| Attorney for Plaintiff and Respondent: | Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Seth K. Schalit, Supervising Deputy Attorney General, Leif M. Dautch, Deputy Attorney General. |