******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

McDONALD, J., with whom PALMER, J., joins, dissenting. A fair reading of the evidence presented by the state in this case plainly reveals two things. First, the police exhibited a remarkable lack of inquisitiveness in eliciting information that might have confirmed whether Malik Singer, the New Jersey murder suspect being sought, had been in the vicinity of the Stamford apartment building where the warrantless search was performed. Second, the state had evidence other than that obtained by the so-called investigation that might have shed some light on this subject, but evidently concluded that it was unnecessary to produce that evidence to the court to justify that search. As a result of these omissions, it is clear that the state failed to meet its burden of proving that exigent circumstances existed to justify dispensing with the warrant requirements of the fourth amendment.

As I explain in more detail later in this dissenting opinion, at the time the police officers knocked on the door of the third floor apartment at 239 Knickerbocker Avenue, the sum of the evidence known to them consisted of nothing more than: (1) global positioning system (GPS) data linking a third party's cell phone thought to be in Singer's possession[1] to somewhere in the general vicinity of this address for perhaps as little as an instant in the preceding forty-one hours; and (2) information that a resident of a third floor apartment at this address had recently been keeping company with a man who, like Singer, is black. Upon entering the apartment, the police obtained no further information other than the fact that there were not one but two black men staying in a bedroom of that apartment.

The majority's conclusion that the record in this case supports a warrantless entry into a bedroom in the middle of the night should concern us all. The most likely, and profoundly sad, ramifications of today's decision will fall disproportionately on members of our minority communities, given that its import means that it is enough to cast suspicion on someone simply because he has the same skin color as a criminal suspect. I am compelled, therefore, to dissent.

I agree with the majority that, in determining whether exigent circumstances existed due to concerns regarding the safety of the officers or others, the trial court was required to examine the "totality of the circumstances" to determine whether the police had reasonable grounds to believe that if an immediate entry was not made, the accused might endanger the safety of the officers or others. (Internal quotation marks omitted.) *State* v. *Guertin*, 190 Conn. 440, 453, 461 A.2d 963 (1983). "This is an objective test; its preeminent criterion is what a reasonable, well-trained police officer would

believe, not what the . . . officer actually did believe." (Emphasis omitted; internal quotation marks omitted.) Id.

In reviewing the trial court's determination that such reasonable grounds existed in the present case, I note that, although unacknowledged, the majority decides this case on a different basis than the one on which the trial court relied. The majority concludes that exigent circumstances arose once Blanca Valvo, the tenant of the apartment, indicated to the police that there were two black men in the bedroom with her daughter. It is manifest from the trial court's memorandum of decision, however, that it found that exigent circumstances justifying the warrantless entry arose *before* the police entered Valvo's third floor apartment. Specifically, after summarizing the testimony at the hearing on the motion to suppress, the trial court commenced its ruling by acknowledging that the testimony of the state and defense witnesses was in conflict. The testimony offered by the defense witnesses, Valvo and her daughter, related only to the events that transpired after the police knocked on the apartment door. One such conflict accurately recounted in the trial court's summary was that Valvo testified that she did not consent to the police entry into her apartment, whereas the police witnesses for the state testified that Valvo had given consent. The trial court found it unnecessary, however, to make any credibility assessments or to make any specific, or even implicit, findings on the issue of consent or any other issues on which the testimony was in conflict. Instead, in stating the basis of its decision, the trial court relied exclusively on facts that occurred, or the court *mistakenly believed* had occurred, before the police knocked on Valvo's apartment door. Indeed, the trial court cited the safety of the apartment building occupants as the exigency, with no mention of any risk to the officers.

Contrary to the majority's approach, I would begin with the trial court's essential finding in support of exigent circumstances: "The cell phone ping indicated that the fugitive *had connections with a residence in Stamford focusing on the third floor apartment at 239 Knickerbocker Avenue.*" (Emphasis added.) As I explain subsequently in this dissenting opinion, to the extent that this finding assumes that the police had information connecting the ping to the third floor apartment, it is clearly erroneous. Indeed, contrary to the majority's conclusion, there was no evidence presented specifically connecting the ping to 239 Knickerbocker Avenue.

I begin with what the evidence does not reveal about the ping information provided to the police, as certain fundamental information clearly was available to, but not produced by, the state. The state did not introduce into evidence the subpoena issued to the cellular service provider. It proffered no other evidence as to the spe-

cific request(s) therein, the time when the ping was elicited, or the manner in which the information was obtained.[2] The New Jersey police officers testifying regarding the ping did not indicate whether they had played any direct role in obtaining that information from the service provider. Except for an acknowledgment by one officer that this procedure or technology "may be beyond [his] expertise," and a statement by a second officer that he is "not an authority on cell phone pinging," neither officer indicated the extent, if any, of his prior experience with this procedure.[3]

Thus, no evidence was proffered as to whether a single ping or a series of pings was collected. Cf. *Reynolds* v. *Commonwealth*, Docket No. 2179-12-4, 2014 WL 2187774, *3 (Va. App. May 27, 2014) ("The March order authorized AT&T to 'ping' [the] appellant's phone every fifteen minutes and provide its physical location data to [an] [o]fficer. . . . Beginning at approximately 7:00 p.m., AT&T sent four electronic signals in fifteen-minute increments to [the] appellant's phone. The ping signals registered with cell towers near [the] appellant's phone and provided the phone's approximate GPS coordinate location information to AT&T, which AT&T then forwarded to [the] [o]fficer . . . via email.").

No evidence was proffered as to whether the ping information revealed that the cell phone was stationary, and, if so, for what period, or whether it was in transit. Cf. *People* v. *Barnes*, 216 Cal. App. 4th 1508, 1511, 157 Cal. Rptr. 3d 853 (2013) ("[The officer] . . . testified that 'I asked them to ping the cell phone; they . . . advised me that it was . . . stationary at 16th and Mission Street.' . . . Officers . . . were 'updated' with the results of the continued pinging, i.e., that 'the ping was moving towards the north.' "); *Devega* v. *State*, 286 Ga. 448, 453, 689 S.E.2d 293 (2010) (defendant's cell phone provider "complied [with a request to ping the defendant's phone] and informed the police that the phone was moving north on Cobb Parkway"); *State* v. *Taylor*, Docket No. 25764, 2014 WL 2700846, *1 (Ohio App. June 13, 2014) ("Sprint provided ping information for that phone, and police were able to trace its path from Detroit to the pawn shop at the time of the shooting and then back to Detroit"); see also *United States* v. *Skinner*, 690 F.3d 772, 776 (6th Cir. 2012) ("[b]y continuously 'pinging' the . . . phone, authorities learned that [the defendant] was traveling on Interstate 40 across Texas"), cert. denied,      U.S.     , 133 S. Ct. 2851, 186 L. Ed. 2d 913 (2013). Accordingly, the cell phone believed to be in Singer's possession may have been at the location ascertained for only an instant while it was in transit.

In the absence of such basic evidence, we are left with whatever reasonable inferences may be drawn from the limited evidence proffered. First, as the majority acknowledges, it is reasonable to infer that the ping

information was captured between the time that New Jersey police officers discovered the victim's body and the time that they contacted the Stamford Police Department with the information yielded from the ping. That simply means that the ping was undertaken sometime within an approximate forty-one hour period before the officers arrived at Valvo's apartment at approximately midnight on the day after the murder.[4] Second, the ping was described as yielding information through GPS data that gave a latitude and longitude corresponding to the "vicinity," "general area," or "generalized area" of a location around 239 Knickerbocker Avenue.

In support of its conclusion that the ping "limited the scope of the search to a very small area—the apartment units within the building at 239 Knickerbocker Avenue," the majority mischaracterizes the testimony. According to the majority: "Based on the longitude and latitude, the ping was identified as originating from 239 Knickerbocker Avenue . . . ." What Detective David Whipple of the Somerset County Prosecutor's Office actually said was that the GPS data "would give you a generalized area around the location, within a certain amount of degree of yards."[5] Whipple never indicated whether that amount was three yards or 300 yards. A review of other cases in which courts have relied on cell phone ping information reveals that a ping can correspond to a fairly large area.[6] See, e.g., *People* v. *Barnes*, supra, 216 Cal. App. 4th 1511 (officer testified that he had been informed by telephone company that pinging would "find a general location within [fifteen] yards or [fifteen] meters of where the phone was"); *People* v. *Henry*, Docket No. 3-10-0106, 2011 WL 10468068, *3 (Ill. App. November 8, 2011) ("ping identified a 698–meter range in which the phone was located," corresponding to approximately 763 yards or 2290 feet); *Stone* v. *State*, 178 Md. App. 428, 437, 941 A.2d 1238 (2008) ("[a]t [a trooper's] request, the service provider conducted a 'ping' of the appellant's cell phone, which revealed that the phone was 'within a two mile radius of the Frederick County Detention Center' "); *People* v. *Moorer*, 39 Misc. 3d 603, 606, 959 N.Y.S.2d 868 (2013) (officer "was advised by Sprint that it had an '[eleven] meter ping' of the phone on Zimbrich Street, between Remington Street and Joseph Avenue," area that corresponds to thirty-six feet); *State* v. *Taylor*, Docket No. 25764, 2014 WL 2700846, *1 n.2 (Ohio App. June 13, 2014) ("[p]ings are GPS locations that are [emitted] from phones that will give a geographic location of the phone, and it will range usually in meters" [internal quotation marks omitted]); *Commonwealth* v. *Rushing*, 71 A.3d 939, 946 (Pa. Super. 2013) ("[p]olice were able to fix the location of [the] [a]ppellant's phone within [ninety-eight] meters or approximately 300 feet"), appeal granted in part, 84 A.3d 699 (Pa.), appeal denied, 85 A.3d 483 (Pa. 2014); see also *In re Application of United States*, 727 F. Supp.

2d 571, 580 (W.D. Tex. 2010) ("[e]stimates from three years ago were that over 90 [percent] of cell phones then in use had GPS capabilities, through which the target phone could be located to within as little as [fifty] feet"). Because the area in which 239 Knickerbocker Avenue is located was described as "a residential area" in which "[h]omes are very close together," the "degree of yards" would have been essential to narrow down the location of the cell phone when it was pinged.

Indeed, consistent with the testimony in the present case, these decisions indicate that it is often through the process of subsequent investigation that the area identified is narrowed to a more particularized location. See, e.g., *People* v. *Henry*, supra, 2011 WL 10468068, *3 ("The ping identified a 698–meter range in which the phone was located. A canvass of that area revealed it to be in the neighborhood of the victim's apartment complex."); *People* v. *Washington*, Docket No. 11-255 (LMH), 2012 WL 2031345, *1 (N.Y. Co. June 4, 2012) ("One or more cell phones were stolen during the robbery and by 'pinging' them, the officers were able to trace the location of the phones to Newland Avenue in Jamestown. They went to Jamestown and, assisted by members of the Chautauqua County Sheriff's Department and Jamestown Police Department, attempted to more precisely locate the phones."); *Commonwealth* v. *Rushing*, supra, 71 A.3d 946 (after police fixed location of appellant's cell phone within approximately 300 feet through ping, "[p]olice determined [the] [a]ppellant's precise location after observing [his former girlfriend's] stolen car outside of a residence and interviewing two individuals who exited that home"); *State* v. *Harrison*, Docket No. 02-13-00255-CR, 2014 WL 2466369, *4 (Tex. App. May 30, 2014) ("police officer found [the] appellee after officers did a ping on his phone that [they] knew he was using and it put him in a location and area, and phone records came back and gave [the officer] an address directly to that area" [internal quotation marks omitted]).

I next turn, therefore, to the evidence presented regarding the information gleaned as a result of the subsequent investigation at the area identified by the ping. Sergeant Paul Guzda of the Stamford Police Department, who conducted that investigation, was operating under the misimpression that the cell phone ping had been connected specifically to 239 Knickerbocker Avenue. He acknowledged that the only thing he knew about Singer's appearance at this time was that Singer was black. After arriving at this location, Guzda was approached by a "concerned citizen"—the landlord of 239 Knickerbocker Avenue. Guzda indicated that he had provided this person with "limited information as to why we were there." Guzda further indicated that, in response to whatever he had conveyed, the landlord volunteered that the daughter of the Hispanic woman living in the third floor apartment recently had

been "keeping company with" a black man. It is clear from Guzda's testimony, however, that he did not recite the landlord's comments verbatim. For example, Guzda initially reported the landlord's statement as conveying that this man "basically" matched Singer's "description." Subsequent repeated questioning clarified that the *only* physical characteristic reported by the landlord was the man's skin color—black.[7] Although Singer has a facial tattoo, a unique and obvious identifying feature, the landlord made no reference to that feature, and nothing indicates that Guzda asked for any further descriptive information.

In addition, to the extent that the landlord indicated that this man "recently" had been keeping company with his tenant's daughter, nothing indicates that Guzda sought to ascertain the period to which the landlord referred. Recently could mean the past six months, the past few weeks, or the past few days.[8] Guzda apparently did not determine whether the man observed by the landlord had been seen in Stamford at the same time that Singer was allegedly committing the murder in New Jersey, a fact that would have made clear that this man was not Singer. Moreover, neither Guzda nor any other officer showed the landlord a photograph of Singer after the New Jersey police arrived with one because they "didn't feel comfortable sharing too much with this party." Thus, at the time the police knocked on Valvo's apartment door, all they reasonably believed was that Singer *possibly* was in possession of a cell phone, that this cell phone had been in the *vicinity* of 239 Knickerbocker Avenue *at some moment* in the preceding *forty-one hours*, and that a man who has the same *skin color* as Singer had been staying in the third floor apartment of 239 Knickerbocker Avenue *for an unspecified period of time*. Any fair application of the law to the facts should inexorably lead to the conclusion that these facts are insufficient to support the trial court's finding that exigent circumstances existed on the basis of information known to the police before they entered the apartment.

Nevertheless, for reasons that are not apparent, the defendant implicitly has conceded on appeal that Valvo consented to the police entry into her apartment. Therefore, I agree with the majority that it is appropriate for us to consider whether there is a reasonable view of the evidence that demonstrates that such exigency arose after the police entered. The only fact that this evidence reveals, however, is that Valvo indicated in response to police questioning that there was not one undifferentiated black man in the apartment, but two! This fact does nothing to elevate the ambiguous information known before the police knocked on the door to a reasonable basis to believe that either black man might be Singer.

Each officer testifying as to the exchange with Valvo

provided slightly different versions of that exchange. The officers testified, however, in a generally consistent manner to a sequence of events under which Valvo acknowledged the presence of the two black men in the bedroom in response to a series of specific innocuous questions, and pointed to the bedroom simply to indicate where her daughter and these two black men were located. One of the officers testified that Valvo specifically stated in response to statements or questions by the officers that she did not know anyone named Malik Singer, although it undoubtedly is possible that Singer might have been known to Valvo by another name. Another officer indicated that he had showed Valvo a photograph of Singer, a fact that was either unobserved or contradicted by the testimony of all three of the other officers present, but that officer's testimony did not indicate that Valvo pointed toward the bedroom in response to, or immediately after being shown, that photograph.[9]

Thus, the exchange with Valvo added nothing of substance to the information known to the police before they entered her apartment except that there were in fact black men in the apartment. I concede that it is entirely possible that the state had other evidence that it did not present that could have demonstrated the reasonableness of the belief of the officers at the scene that Singer, or one of his associates, was in the third floor apartment of 239 Knickerbocker Avenue. After all, it would have been an enormous stroke of luck to have located such an associate on the basis of the evidence proffered at the hearing on the motion to suppress.[10] Moreover, I appreciate that, because the police officers were searching for a presumably armed and dangerous murder suspect, they must be afforded some latitude in securing premises in which such a suspect may be hiding. Nonetheless, it is the state's obligation to come forward with evidence to demonstrate that there was an objectively reasonable basis to believe that such a danger existed. The majority has failed to hold the state to that burden.

[1] As the majority explains, the cell phone was registered to a third party who had no known connection to Singer when the search was performed, and the information linking the cell phone to Singer came from a girlfriend of an alleged accomplice of Singer.

[2] Although no evidence regarding this technology was introduced in the present case, it appears that a cell phone may be "pinged" in one of two ways. According to technical sources cited in one law review article: "To 'ping' a device, the carrier essentially sends a signal to the phone, similar to a call. The phone responds by sending a signal to the closest towers, resulting in the phone's location using triangulation. This entire process is done without the knowledge of the user. . . . Alternatively, most modern cellular phones are equipped with internal software and hardware to receive information from global positioning satellites in orbit around the globe, and the phone can use this information to determine its own location. . . . The phone can then pass on this location data to any program or application which requests it." (Citations omitted.) Note, "Keeping Track of the Joneses: Redefining the Privacy Boundaries of the Digital Age," 87 S. Cal. L. Rev. Postscript 1, 5 n.7 (2014), available at http://lawreview.usc.edu/wp-content/

uploads/Kroll-87-PS-Final-PDF.pdf.

[3] Some courts have concluded that expert testimony is required when such evidence is presented to a jury. See, e.g., *Coleman-Fuller* v. *State*, 192 Md. App. 577, 615–19, 995 A.2d 985 (2010). In the present case, the defendant did not challenge the qualifications of the officers presenting testimony on this subject.

[4] The evidence reveals that the victim's body was discovered around 7 a.m. on May 11, 2008, and the New Jersey officers contacted the Stamford Police Department with the location yielded from the ping sometime around 9:30 p.m. on May 12, 2008. This means that the ping was elicited some time within an approximate thirty-eight and one-half hour period, and approximately two and one-half hours later, at approximately midnight, the police arrived at Valvo's apartment door.

[5] The following exchange occurred during Whipple's cross-examination at the hearing on the motion to suppress:

"Q. With regard to the GPS, you said that you had a generalized area.

"A. Correct.

"Q. And that generalized area was Knickerbocker Avenue?

"A. In the vicinity of 239 Knickerbocker Avenue.

"Q. How was it that it's the vicinity of 239 Knickerbocker?

"A. Well, it may be beyond my expertise, but the GPS—what they'll do is, the cell phone company will ping a cell phone. And that would give you a generalized area around the location, within a certain amount of degree of yards.

"Q. Okay.

"A. That's the information of longitude and latitude which the cell phone company provided us.

"Q. Okay. So, if I'm not mistaken, didn't you say in direct [examination] that it was the Stamford Police Department's investigation that actually led to 239 Knickerbocker Avenue?

"A. Yes.

"Q. Okay. So, before that, you didn't know it was 239.

"A. Specifically, no."

[6] The wide range of areas yielded in these cases seems to suggest that various factors may affect the size of the area corresponding to the ping, including the type of cell phone and the technology used by the service provider. See, e.g., *In re United States for an Order Authorizing the Use of Two Pen Register & Trap & Trace Devices*, 632 F. Supp. 2d 202, 208 (E.D.N.Y. 2008) (indicating that "the information revealed by triangulation or by more advanced communications devices like the iPhone, which contain [g]lobal [p]ositioning [s]ystem devices, is . . . precise enough to enable tracking of a telephone's movements within a home"); see also F. Arcila, Jr., "GPS Tracking Out of Fourth Amendment Dead Ends: *United States* v. *Jones* and the *Katz* Conundrum," 91 N.C. L. Rev. 1, 7 n.16 (2012) ("[c]ellular tracking is less precise than GPS tracking").

[7] The following exchange took place during Guzda's direct examination at the hearing on the motion to suppress:

"Q. Where—let me ask that differently. Did you—what did you do, with respect to the area of Knickerbocker Avenue. Did you do any kind of investigation about that area?

"A. Yes, we did.

"Q. And what did you do?

"A. Knowing that we were looking for somebody who was wanted for a homicide, and was probably armed and dangerous, we made sure that we carefully checked the area. Specifically the area of 239 Knickerbocker Avenue. During that time, we spoke with a concerned citizen who lived in that area, who had direct knowledge of 239 Knickerbocker Avenue, and the residence.

"And we took this person into our confidence, giving them limited information as to why we were there. And they explained to us, on the top floor of that building, there was a Hispanic female, who lived there with her daughter. And most recently, she was keeping company with a black male who fit the description of Singer."

The following exchange later ensued at the hearing during Guzda's cross-examination:

"Q. . . . [W]hen were you contacted by the New Jersey authorities with regard to the . . . Singer matter?

"A. Sometime that evening—earlier that evening.

"Q. Okay. Did they fax you over a photo of him?

"A. I do not recall.

"Q. Was it requested by you?

"A. No. . . .

"Q. Was it requested by anyone in your unit?

"A. Not that I know of.

"Q. So all you had [was] a description of . . . a black male.

"A. Yes.

"Q. That could have been any black male in the city of Stamford?

"A. Yes.

"Q. Okay. So you went to 239 Knickerbocker Avenue. And this concerned party, all they told you was, there's a black male on the third floor?

"A. Who told me that?

"Q. The concerned citizen that you spoke with.

"A. When we shared information with this concerned citizen, he in turn, confirmed who lived on that third floor—that top floor. And told us that the young lady who lived there, was recently keeping company with a black male that basically fit the description of . . . Singer.

"Q. Okay. But again, you indicated that could have been almost any black male in the city of Stamford?

"A. The description was that they—sure, it could have fit the description of numerous other black males.

"Q. Did you ask this concerned citizen, whether or not it was . . . Singer [that] was on the third floor?

"A. No.

"Q. So, at that moment all you have is; there's on the third floor, a black male?

"A. Yes."

According to Whipple's testimony at trial, the New Jersey officers had been informed that all that the landlord conveyed was that the man with his tenant's daughter was black. The following exchange occurred during Whipple's cross-examination:

"Q. When you arrived at 239 Knickerbocker—I apologize. I withdraw that. The Stamford police officers, when they went there, asked the landlord of that building whether or not they knew of an African-American male?

"A. I wasn't present when they were talking to him, but they reported that to me.

"Q. Okay. And that person—that landlord said, on the third floor?

"A. They said that there were—there was supposedly an African-American gentleman that resided somewhere, or was located somewhere on the third floor.

"Q. Okay. And I think you testified to the fact that you also knocked on other doors—a second floor apartment—first floor apartment.

"A. I didn't. Other officers did.

"Q. Okay. Because you weren't sure as to which apartment . . . Singer may have been in?

"A. Specifically; no.

"Q. Okay. When you arrived at the scene with the photo of . . . Singer, did you show the landlord that picture?

"A. I didn't speak with the landlord.

"Q. Okay. Did you provide it to the Stamford Police Department?

"A. I had showed it to them earlier that night.

"Q. Did you provide—did you ask the Stamford Police Department to show the landlord, to make sure it was the right person?

"A. No.

"Q. Okay. You identified [the defendant, Said Kendrick]. Does [the defendant] have teardrop tattoos on his face?

"A. Nope.

"Q. So, the only thing tying him to . . . Singer, is that he's an African-American male.

"A. I'm not sure I understand the question.

"Q. The only physical—the only comparable physical qualities that [the defendant] has with . . . Singer is that he's an African-American male?

"A. Physical description-wise?

"Q. Yes.

"A. Yes."

[8] Testimony from Valvo and her daughter indicated that the defendant had been living at Valvo's apartment for as long as two years. Therefore, it is unclear whether the defendant was the person who the landlord had observed recently keeping company with the daughter or whether it was the defendant's cousin, who was the other "black" man in the daughter's bedroom.

[9] Whipple initially gave the following testimony during direct examination at the suppression hearing:

"Q. When—what happened when . . . Valvo invited you into the apartment?

"A. Myself, as well as a few of my colleagues were invited into the living room. I—obviously we identified ourselves as police. I had my badge displayed. We explained we were there searching for an individual known as Malik Singer, and asked if in fact, that individual was present.

"Q. And did she tell you anything specific about . . . Singer?

"A. Not about . . . Singer. She indicated that her daughter was in a bedroom with two African-American males.

"Q. And did she show you where that bedroom was?

"A. Yes."

On cross-examination, Whipple provided the only testimony that Valvo had been shown a photograph of Singer, but the following exchange clearly indicates that Valvo pointed toward the bedroom in connection with her response that there were two black men with her daughter, not in response to being shown Singer's photograph:

"Q. . . . Who knocked—you said—you indicated you knocked on the door?

"A. I was one of them, yes.

"Q. And you spoke to . . . Valvo?

"A. Yes.

"Q. Okay. And you showed her a picture of . . . Singer; correct?

"A. I did.

"Q. Okay. And then, she told you she didn't know who he was?

"A. Basically, the conversation I had with . . . Valvo, she indicated that two African-American males were in the bedroom currently, with her daughter. Then she pointed to it, once I explained what we were there for.

"Q. Okay. But you showed her a picture?

"A. Yeah.

"Q. And that picture was of . . . Singer?

"A. Correct.

"Q. Which wasn't one of the persons in that bedroom?

"A. Correct.

"Q. Okay. And she told you, she didn't know who that person was?

"A. I don't recall that specifically."

Even if we were to assume that Whipple's testimony is ambiguous as to whether Valvo pointed toward the bedroom in response to something he said or did rather than in connection with her exchange with the Stamford officers, the appropriate recourse would be for this court to remand the case to the trial court for another hearing on the motion to suppress to allow a trier of fact to make the requisite findings, not for this court to do so. "[W]e may uphold the court's ruling [of exigency to excuse the warrant requirements] if there is any reasonable view of the evidence to support it." (Internal quotation marks omitted.) *United States* v. *Creighton*, 639 F.3d 1281, 1290 (10th Cir. 2011). In the present case, the trial court did not determine that exigency arose after the police entered Valvo's apartment, and reading Whipple's testimony to mean that Valvo pointed to the bedroom in response to being shown Singer's photograph places it in conflict with the other officers' testimony.

[10] Although our inquiry focuses on what the officers reasonably believed before entering, I note that the police did not recover the cell phone that had been pinged at the Stamford apartment. The information connecting the cell phone to Singer was tenuous. See footnote 1 of this dissenting opinion. Moreover, according to a statement purportedly made by the defendant, Said Kendrick, to the police after being taken into custody, the defendant obtained the gun from Singer in New Jersey. Singer was arrested in New Jersey. Thus, there is nothing to indicate that Singer ever was in Stamford.