******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* SAID KENDRICK
(SC 18914)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald and Espinosa, Js.

*Argued October 21, 2013—officially released October 21, 2014*

*Marjorie Allen Dauster*, senior assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, and *David R. Applegate*, assistant state's attorney, for the appellant (state).

*James B. Streeto*, assistant public defender, for the appellee (defendant).

*Opinion*

ESPINOSA, J. The sole issue in this certified appeal is whether the Appellate Court properly reversed the judgment of conviction of the defendant, Said Kendrick, of criminal possession of a firearm in violation of General Statutes (Rev. to 2007) § 53a-217 (a) (1),[1] on the basis of its conclusion that the trial court improperly denied the defendant's motion to suppress evidence obtained by the police as a result of their warrantless entry into a bedroom where the defendant was sleeping. Following our grant of certification,[2] the state appeals from the judgment of the Appellate Court, and claims that because the police officers reasonably believed that the warrantless entry into the bedroom was necessary to protect the safety of the officers and others on the premises, the entry did not violate the defendant's rights under the fourth amendment to the United States constitution. We agree and reverse the judgment of the Appellate Court.

The jury reasonably could have found the following facts. On the evening of May 12, 2008, Detective David Whipple, a police officer with the Somerset County Prosecutor's Office in New Jersey, informed officers in the Stamford Police Department that New Jersey police were investigating a homicide, and had reason to believe that a suspect, Malik Singer, was in the area of 239 Knickerbocker Avenue in Stamford. Sometime between 11 p.m. and midnight, after the Stamford police had received information causing them to focus on the third floor apartment of the building at that address, New Jersey and Stamford police officers proceeded to that third floor apartment, knocked on the door, and were invited into the apartment by the tenant, Blanca Valvo. After officers informed Valvo why they were there, she told them that two African-American males were in the rear bedroom of the apartment, along with her daughter, Andrea Valvo, and pointed to the bedroom door. The New Jersey officers immediately entered the bedroom, where the defendant was lying in bed with Andrea Valvo. A second man, James Spurgeon, was lying on a mattress that was on the floor at the foot of the bed. The officers ordered the bedroom occupants not to move, whereupon the defendant lunged toward an object on the floor near the bed. The police restrained and handcuffed the defendant and Spurgeon. After the two men were secured, Sergeant Louis DeMeo of the Somerset County Prosecutor's Office searched the area toward which the defendant had lunged and discovered a backpack that was partially opened. When he looked inside, DeMeo saw the handle of a revolver protruding from a pair of black sneakers inside the backpack. The Stamford police then took custody of the backpack, the defendant and Spurgeon. The defendant subsequently admitted to Whipple that he had received the backpack and revolver from Singer, who had asked

the defendant to take them with him. The defendant further admitted that at the time that Singer gave him the backpack, the defendant knew that it contained the revolver.

The defendant was charged with criminal possession of a firearm in violation of § 53a-217 (a) (1). Following the court's denial of the defendant's motion to suppress, the parties stipulated to the defendant's previous felony conviction, and the case was tried to a jury. The jury found the defendant guilty, the court rendered judgment of conviction in accordance with the jury's verdict, and the defendant subsequently was sentenced to a two year mandatory term of imprisonment. *State* v. *Kendrick*, 132 Conn. App. 473, 475–77, 31 A.3d 1189 (2011).

The defendant appealed from the judgment of conviction to the Appellate Court, which held that the trial court had improperly denied the defendant's motion to suppress. Id., 475. Specifically, the Appellate Court concluded that, viewing the evidence under the totality of the circumstances, "it was unreasonable for the police to assume that Singer was present in the apartment or the bedroom and [posed] an imminent threat of harm to its occupants." Id., 486. Therefore, the Appellate Court reversed the judgment of conviction and remanded the case with direction to grant the defendant's motion to suppress. Id., 490. This certified appeal followed.

The state argues that the Appellate Court improperly required that there be "direct evidence" that Singer was present in the apartment in order to justify the warrantless entry into the bedroom. Although we disagree with the state's characterization of the Appellate Court's rationale, we conclude that viewed under the totality of the circumstances, the police had a reasonable belief that exigent circumstances justified the entry into the bedroom. Specifically, on the basis of the facts known to the officers at the time that they entered the bedroom, the police reasonably believed that the entry was necessary to protect their own safety and the safety of the occupants.

The following additional facts are relevant to the resolution of this appeal. In connection with the shooting death of a victim whose body was discovered in New Jersey at 7 a.m. on May 11, 2008, New Jersey police officers obtained an arrest warrant for Singer, who police believed had fled the scene of the murder with a gun in his possession. At the time that New Jersey police were investigating Singer's whereabouts, they had reason to believe that Singer was using a cell phone that was registered to a person named Ann Marie Pettigrew.[3] Specifically, the girlfriend of an alleged participant in the murder provided Pettigrew's cell phone number to the police, based on her belief that the cell phone belonged to Singer. Relying on that information, the police secured a subpoena ordering the cell phone

company to "ping" the cell phone, a process that yielded a location defined by longitude and latitude.[4] Whipple, who testified regarding the significance of the ping, initially indicated that a ping identifies "just a general area," but later stated that the "general area" is "within a certain amount of degree of yards."[5] Based on the longitude and latitude, the ping was identified as originating from 239 Knickerbocker Avenue, a three-story multifamily home with several small apartments.[6]

After New Jersey police officers had conveyed this information to the Stamford Police Department, Sergeant Paul Guzda of the Stamford Police Department went to Knickerbocker Avenue to investigate. He spoke to the landlord of 239 Knickerbocker Avenue, who told him that on the third floor of the building lived a Hispanic woman whose daughter had been keeping company with an African-American man who fit Singer's general description.[7]

The police did not obtain either a warrant to search the third floor apartment at 239 Knickerbocker Avenue or a warrant for the arrest of the defendant. Instead, armed with the arrest warrant for Singer, shortly before midnight on May 12, 2008, a large presence of New Jersey and Stamford police officers reported to Knickerbocker Avenue, including Guzda's entire squad, numerous police officers from New Jersey, as well as a number of patrol officers with the Stamford Police Department. Guzda and Miriam Delgado, a Stamford police officer who spoke Spanish, ascended the outside staircase to the third floor, accompanied by numerous Stamford and New Jersey police officers.[8] Although Guzda and Delgado were in plainclothes, both had their badges displayed.

Witness testimony regarding the interaction between the police officers and Valvo reveals that the details of that exchange were in dispute. Although the trial court made no specific findings regarding these details, in light of the trial court's ruling in favor of the state, it is logical to begin with the assumption that the court credited the testimony of the state's witnesses rather than that of the defendant's witnesses. Employing that presumption eliminates some, but not all, of the conflicting testimony, because the testimony of the state's witnesses was not internally consistent as to all of the details. Because, however, our review of the record reveals that the uncontroverted aspects of the testimony of the state's witnesses supports the ruling of the trial court, we need not speculate as to how the trial court might have resolved those inconsistencies, and we accordingly derive our summary of the facts solely from the internally consistent testimony of the state's witnesses.[9]

When one of the officers knocked, Valvo opened the apartment door. After the officers identified themselves and told her that they needed to speak to her, Valvo

let them in to the kitchen area.[10] The apartment was very small, with a bedroom toward the back, about ten to fifteen feet from where the officers were standing, and another room to the right. The door to the bedroom was slightly open and the bedroom lights were off. In response to police inquiries related to their investigation, Valvo pointed toward the bedroom and indicated that there were two African-American men in the bedroom with her daughter.[11]

As soon as Valvo indicated that there were two African-American men in the bedroom, the New Jersey officers approached the bedroom door, then knocked and entered. Whipple was among the New Jersey police officers who entered the bedroom and identified themselves as law enforcement. As they entered the darkened bedroom, one of the officers turned on a light and Whipple saw the defendant in the bed with a Hispanic woman, and another African-American man, Spurgeon, lying on a mattress on the floor at the foot of the bed. The police instructed the persons not to move, whereupon the defendant lunged toward something beside the bed. After Whipple grabbed the defendant, the police handcuffed both him and Spurgeon. When DeMeo examined the area toward which the defendant had lunged, he discovered a partially opened backpack with a loaded .38 caliber revolver inside. The record does not reflect that the police recovered the cell phone, either from the defendant's person or from the apartment.

Preliminarily, we clarify what is not at issue in this appeal. The defendant does not claim that the police lacked consent to enter the apartment, and does not challenge the search of the backpack in which the revolver was discovered. *State* v. *Kendrick*, supra, 132 Conn. App. 478 n.4. He challenges only the warrantless entry into the bedroom. Additionally, the state does not contest that the defendant had an expectation of privacy in the bedroom. Id. Accordingly, the only question presented in this appeal is whether, once the officers were in the apartment with Valvo's consent, their subsequent warrantless entry into the bedroom violated the defendant's rights under the fourth amendment to the United States constitution, or whether that entry was justified under the exigent circumstances doctrine.

"As a general matter, the standard of review for a motion to suppress is well settled. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, [however] and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are

supported by substantial evidence. . . . [W]here the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Boyd*, 295 Conn. 707, 717, 992 A.2d 1071 (2010), cert. denied,      U.S.    , 131 S. Ct. 1474, 179 L. Ed. 2d 314 (2011). Accordingly, the trial court's legal conclusion regarding the applicability of the exigent circumstances doctrine is subject to plenary review.[12]

"Notwithstanding our responsibility to examine the record scrupulously, it is well established that we may not substitute our judgment for that of the trial court when it comes to evaluating the credibility of a witness. . . . It is the exclusive province of the trier of fact to weigh conflicting testimony and make determinations of credibility, crediting some, all or none of any given witness' testimony. . . . Questions of whether to believe or to disbelieve a competent witness are beyond our review. As a reviewing court, we may not retry the case or pass on the credibility of witnesses. . . . We must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude. . . .

"[I]f, upon examination of the testimonial record, the reviewing court discovers but one version of the relevant events upon which both the state and the defendant agree, and such agreement exists both at trial and on appeal, the reviewing court may rely on that version of events in evaluating the propriety of the trial court's determinations and determining whether the trial court's factual findings are supported by substantial evidence. In a case where the trial court has concluded that the police action at issue was justified and the undisputed version of events reflected in the transcript was adduced by the state through testimony of the police officers who were involved, a reviewing court's reliance on that version of events is particularly appropriate. If the officers' own testimony as to what occurred is internally consistent and uncontested by the defendant but, in fact, undercuts the trial court's ruling in favor of the state, a reviewing court would be remiss in failing to consider it." (Citation omitted; internal quotation marks omitted.) *State* v. *DeMarco*, 311 Conn. 510, 519–20, 88 A.3d 491 (2014).

"It is axiomatic that the police may not enter the home without a warrant or consent, unless one of the established exceptions to the warrant requirement is met. Indeed, [p]hysical entry of the home is the chief evil against which the wording of the fourth amendment is directed." (Internal quotation marks omitted.) *State* v. *Ryder*, 301 Conn. 810, 821, 23 A.3d 694 (2011). Nighttime intrusions into the home are examined with particularly

intense scrutiny. *Jones* v. *United States*, 357 U.S. 493, 498, 78 S. Ct. 1253, 2 L. Ed. 2d 1514 (1958).

The trial court analyzed the defendant's motion to suppress under the exigent circumstances doctrine, and we conclude that the doctrine is implicated by the facts of the present case. Because the trial court's factual findings in its ruling on the defendant's motion to suppress are very limited, in summarizing the relevant facts, we include facts that are implicitly included in the trial court's ruling, and we also look to the record for evidence that supports the trial court's ruling. See, e.g., *State* v. *Azukas*, 278 Conn. 267, 276, 897 A.2d 554 (2006) (reading trial court's decision denying motion to suppress to include implicit finding that homeowner had authority to consent to search of defendant's bedroom); *State* v. *Jones*, 193 Conn. 70, 79, 475 A.2d 1087 (1984) (reading trial court's denial of motion to suppress, in light of evidence produced at suppression hearing, to "include implicit findings that the defendant's parents had the authority to consent to the searches and did in fact voluntarily consent"); see also *State* v. *Martin*, 2 Conn. App. 605, 614, 482 A.2d 70 (1984) (The Appellate Court declined to add facts not found by the trial court, because "the court issued a factually detailed memorandum of decision which did not refer to this evidence. When the court rules on a motion to suppress without detailing the facts supporting its decision, an appellate court may look to the evidence produced in support of the ruling. . . . But where, as here, the trial court performs its judicial function conscientiously by detailing the facts which the state has established, we are not free to add facts which are not found and which are not undisputed." [Citation omitted.]), cert. denied, 195 Conn. 802, 488 A.2d 457, cert. denied, 472 U.S. 1009, 105 S. Ct. 2706, 86 L. Ed. 2d 721 (1985).

The exigent circumstances doctrine is one of three exceptions to the warrant requirement that are triggered by the need for swift action by the police. All three exceptions, the exigent circumstances doctrine, the protective sweep doctrine and the emergency doctrine, must be supported by a reasonable belief that immediate action was necessary. Because our decisions have not been entirely clear regarding the distinctions among the three doctrines, as well as the areas in which they overlap, we take this opportunity to clarify. Our decision in *State* v. *Aviles*, 277 Conn. 281, 891 A.2d 935, cert. denied, 549 U.S. 840, 127 S. Ct. 108, 166 L. Ed. 2d 69 (2006), illustrates the ease with which the doctrines may become confused, and thus, the need for clarification. In that case, the defendant had fled the murder scene after shooting the victim in the chest. Id., 285. The murder weapon had not been recovered. Id., 295. The next morning, police officers received information that the defendant was located in an apartment at 7 Cossett Street in Waterbury. Id., 285. When a police officer arrived at the apartment, where the defendant

was staying as an overnight guest, a woman opened the door and invited the officer into the apartment. Id., 288. When he entered the apartment, the officer "could see the defendant through an open doorway in one of the apartment's bedrooms." Id. The officer entered the bedroom, and, although he did not handcuff the defendant, he searched the area of the bedroom within the immediate reach of the defendant, including under the bed, for the gun involved in the shooting. Id., 289. It was undisputed that the officer had not obtained any warrant, either for the defendant's arrest, or to search the apartment. Id., 303. This court, however, took as its starting point the fact that there was probable cause to believe that the defendant was the shooter, and the fact that the officer was lawfully on the premises at the time that he saw the defendant in the bedroom. Id., 295. In light of those facts, the issue was whether a reasonable officer would have believed that exigent circumstances justified the warrantless entry, that is, whether the entry into the bedroom was necessary because absent an immediate arrest, the defendant could destroy evidence, flee or endanger human life. Id., 293–95. Although we properly concluded that exigent circumstances justified the warrantless entry into the bedroom; id., 295; we inadvertently included in our analysis a discussion of the emergency doctrine that could be read to mean that the emergency doctrine and exigent circumstances doctrine are one and the same. Id., 294. Although it is true that both doctrines are based on the principle that under certain circumstances the police must act immediately, we clarify that our decision in *Aviles* was grounded on our conclusion that exigent circumstances justified the warrantless entry into the bedroom.

In light of the past confusion in our application of the exigent circumstances, protective sweep and emergency doctrines, we take this opportunity to clarify the contours of each doctrine individually, summarizing its key elements, then highlighting the distinctions and similarities of the three doctrines. Of the three, the exigent circumstances doctrine arguably encompasses the widest variety of factual scenarios. We previously have recognized the catch-all quality of the doctrine, explaining that "[t]he term, exigent circumstances, does not lend itself to a precise definition but generally refers to those situations in which law enforcement agents will be unable or unlikely to effectuate an arrest, search or seizure, for which probable cause exists, unless they act swiftly and, without seeking prior judicial authorization." (Internal quotation marks omitted.) *State* v. *Gant*, 231 Conn. 43, 63–64, 646 A.2d 835 (1994), cert. denied, 514 U.S. 1038, 115 S. Ct. 1404, 131 L. Ed. 2d 291 (1995). There are three categories of circumstances that are exigent: those that present a risk of danger to human life; the destruction of evidence; or the flight of a suspect. *State* v. *Guertin*, 190 Conn. 440, 448, 461 A.2d 963

(1983). The exigent circumstances doctrine, however, is limited to instances in which the police initially have probable cause either to arrest or to search.

This court first formally adopted a test for determining when exigent circumstances justify a warrantless search or seizure in *State* v. *Guertin*, supra, 190 Conn. 448. We considered a number of different tests that had been adopted in various jurisdictions, and opted for a broadly worded, totality of the circumstances test; id., 454; specifically: "whether, under the totality of the circumstances, the police had reasonable grounds to believe that if an immediate arrest [or entry] were not made, the accused would be able to destroy evidence, flee or otherwise avoid capture, or might, during the time necessary to procure a warrant, endanger the safety or property of others. This is an objective test; its preeminent criterion is what a reasonable, well-trained police officer would believe, not what the . . . officer actually did believe." (Emphasis omitted; internal quotation marks omitted.) Id., 453. Put simply, given probable cause to arrest or search, exigent circumstances exist when, under the totality of the circumstances, the officer reasonably believed that immediate action was necessary to protect the safety of those present, or to prevent the flight of a suspect, or the destruction of evidence.

In adopting the totality of the circumstances test, we rejected two distinct tests that expressly would have required the police either to have a strong or at least reasonable belief that the *suspect* was present in order for exigent circumstances to justify a warrantless entry. One of those tests is the multifactored test favored by a number of federal circuit courts, first set forth in *Dorman* v. *United States*, 435 F.2d 385 (D.C. Cir. 1970). Courts that apply what are known as the "*Dorman* factors" consider the following in determining whether a particular set of circumstances rises to the level of exigency: "(1) that a grave offense is involved, particularly one that is a crime of violence; (2) that the suspect is reasonably believed to be armed; (3) that there is a clear showing of probable cause; (4) *that there is strong reason to believe the suspect is in the premises being entered*; (5) that there is a likelihood that the suspect will escape if not swiftly apprehended; (6) that the entry, though not consented to, is made peaceably, although forcible entry may be justified in some instances. Another factor to be considered is (7) the time of entry." (Emphasis added.) *State* v. *Guertin*, supra, 190 Conn. 449–50. In rejecting the *Dorman* factors, we expressed reservations about the workability of such a rule, which would require police officers "to make on-the-spot decisions by a complicated weighing and balancing of a multitude of imprecise factors." Id., 451, citing 2 W. LaFave, Search and Seizure § 6.1, p. 390 (1978). The second test that we considered and rejected in *Guertin* was one that had been proposed as an alternative to

the *Dorman* factors: "Given probable cause to arrest and *a reasonable belief that the suspect is in his home*, exigent circumstances for a warrantless and nonconsensual entry into a suspect's home to effect this arrest exist when a reasonably prudent man in the circumstances would be warranted in the belief that delay incident to securing the warrant would pose a significant risk of danger to life or property, of the escape of the suspect, or of the destruction of evidence." (Emphasis added; internal quotation marks omitted.) *State* v. *Guertin*, supra, 451. Our rejection of both the *Dorman* factors test, as well as the proposed alternate test, in favor of the totality of the circumstances test, clarified that no single factor, such as a strong or reasonable belief that the suspect is present on the premises, will be determinative in evaluating the reasonableness of a police officer's belief that a warrantless entry or arrest was necessary. Rather than evaluating the significance of any single factor in isolation, courts must consider all of the relevant circumstances in evaluating the reasonableness of the officer's belief that immediate action was necessary.

The protective sweep doctrine, like the exigent circumstances doctrine, is rooted in the investigative and crime control function of the police. *Maryland* v. *Buie*, 494 U.S. 325, 327, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990). As its name suggests, the purpose of the doctrine is to allow police officers to take steps "to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack."[13] Id., 333. Although originally a protective sweep was defined as one made incident to a lawful arrest; id., 334; the scope has since been broadened so that the current rule is that "a law enforcement officer present in a home *under lawful process* . . . may conduct a protective sweep when the officer possesses 'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the . . . scene.' " (Emphasis added.) *United States* v. *Miller*, 430 F.3d 93, 98 (2d Cir. 2005), cert. denied, 547 U.S. 1206, 126 S. Ct. 2888, 165 L. Ed. 2d 916 (2006).

Courts that have rejected a rule confining valid protective sweeps to those conducted incident to an arrest have emphasized that, although the sweep in *Buie* was incident to an arrest, the court's conclusion in *Buie* that the search was justified rested on the fact that the arrest "exposed the officers to danger." *United States* v. *Gould*, 364 F.3d 578, 581 (5th Cir.), cert. denied, 543 U.S. 955, 125 S. Ct. 437, 160 L. Ed. 2d 317 (2004). Courts have applied the broadened protective sweep rule set forth in *Buie* to uphold sweeps conducted subsequent to the entry into the home by consent, when the sweep was supported by a reasonable, articulable suspicion.

See, e.g., id., 587; *United States* v. *Patrick*, 959 F.2d 991, 999 (D.C. Cir. 1992).

The emergency doctrine, unlike the exigent circumstances and protective sweep doctrines, is rooted in the caretaking function of the police. The purpose of the emergency doctrine is to allow the police to make a warrantless entry "to render emergency aid and assistance to a person whom they reasonably believe to be in distress and in need of that assistance." *Root* v. *Gauper*, 438 F.2d 361, 364 (8th Cir. 1971); see also *State* v. *Blades*, 225 Conn. 609, 616, 626 A.2d 273 (1993). The police "must have reason to believe that life or limb is in immediate jeopardy and that the intrusion is reasonably necessary to alleviate the threat." (Internal quotation marks omitted.) *State* v. *Ryder*, supra, 301 Conn. 826. In *Blades*, we explained that, similar to the exigent circumstances doctrine, the emergency doctrine justifies a warrantless entry or search when an officer's reasonable belief is "grounded in empirical facts rather than subjective feelings . . . [and] [t]he test is not whether the officers actually believed that an emergency existed, but whether a reasonable officer would have believed that such an emergency existed." (Citation omitted; internal quotation marks omitted.) *State* v. *Blades*, supra, 618–19. The circumstances set forth in *Blades* provide a classic example of facts that implicate the emergency doctrine. In that case, we held that a warrantless entry into the defendant's apartment was justified, where there had been a long history of domestic abuse of the victim by the defendant, concerned family members reported that the defendant had provided a false explanation for the victim's disappearance, and the police observed a smear of blood on the interior side of the rear entrance door to the apartment building. Id., 615–16.

The protective sweep and exigent circumstances doctrines share significant areas of overlap, and some notable distinctions. Although the exigent circumstances doctrine allows the police to act upon their *reasonable belief* that immediate action is necessary to protect the safety of those present, or to prevent the flight of a suspect or the destruction of evidence, the police must have had probable cause for an arrest or search at the outset. *State* v. *Guertin*, supra, 190 Conn. 447. Thus, the exigent circumstances doctrine lends itself to a situation such as in the present case, where the police reported to the scene to make a planned arrest on a warrant supported by probable cause, but subsequent circumstances arose that required them to take action that was supported only by their reasonable belief. By contrast, the police may conduct a protective sweep even in the absence of probable cause to search the premises or arrest a suspect, as long as the officer is lawfully present on the premises at the time that the officer conducts the protective sweep, which of course must be justified by the officer's reasonable belief.

The facts underlying *State* v. *Mann*, 271 Conn. 300, 857 A.2d 329 (2004), cert. denied, 544 U.S. 949, 125 S. Ct. 1711, 161 L. Ed. 2d 527 (2005), aptly illustrate this principle. In that case, the police knocked on the defendant's door after receiving a tip concerning drug activity in that apartment. Id., 303–304. The police were merely following up on the tip—the state did not claim that the police were acting upon probable cause to arrest or search. Id., 306 n.8. In response to the officers' knock, the defendant partially opened his door, then attempted to close it while placing his right hand inside his right pocket. One of the officers drew his gun, entered the apartment, conducted a patdown search of the defendant and discovered plastic bags with rock like substances in them. Id., 304. In holding that the entry was justified, we relied in part on *Buie* to conclude that although there was no probable cause for a search, it was justified because the officers were legally present in the hallway, the defendant voluntarily opened the door, and the defendant's subsequent actions gave rise to a reasonable belief that he may be armed. Id., 312–15, 324. We explained that "[w]e cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." (Internal quotation marks omitted.) Id., 318–19, quoting *Terry* v. *Ohio*, 392 U.S. 1, 24, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

Because the emergency doctrine is rooted in a different function of the police, it stands somewhat apart from the exigent circumstances and protective sweep doctrines. That is, although the emergency doctrine, like the protective sweep and exigent circumstances doctrines, requires that a search be supported by an officer's reasonable belief that immediate action is necessary, the doctrine is rooted in the principle that the police have a duty to respond to emergencies and should not be prevented from rendering emergency assistance when they reasonably believe that such assistance is necessary. This does not mean that there is no overlap between the emergency doctrine and the other two doctrines—it is not always a simple matter to delineate precisely pursuant to which function police are acting in carrying out a particular search or seizure. In fact, we expressly have acknowledged: "Police often operate in the gray area between their community caretaking function and their function as criminal investigators. Often there is no bright line separating the one from the other . . . ." *State* v. *Blades*, supra, 225 Conn.

619. In many instances, however, it is possible to discern whether the police are acting in their crime control or investigative functions, or instead are acting pursuant to their community caretaking function. That distinction, which depends on the particular facts of the case, will determine whether the emergency doctrine applies, as opposed to either the exigent circumstances doctrine or protective sweep doctrine.

In the present case, because the police had an arrest warrant for Singer, supported by probable cause, the trial court properly applied the exigent circumstances doctrine in analyzing the defendant's motion to suppress.[14] The question presented, then, is whether, under the totality of the circumstances, a reasonable, well trained police officer reasonably would have believed that immediate entry into the bedroom was necessary to protect his own safety and the safety of others present in the apartment. See *State* v. *Guertin*, supra, 190 Conn. 453. We must evaluate the reasonableness of the officers' belief in light of the speed with which events were unfolding, and on the basis of the facts known to them at the time that they were standing in Valvo's kitchen and she informed them that ten to fifteen feet away from them, behind a partially open door, were two African-American males. Those facts include that there was probable cause to believe that Singer had committed a homicide within the past two days, and that he was on the run. The murder weapon, a gun, had not been found at the scene of the crime, so police reasonably could have believed that Singer had taken it with him. It is highly significant that the police had traced to that address a cell phone that a witness told them was being used by Singer. That single piece of information limited the scope of the search to a very small area— the apartment units within the building at 239 Knickerbocker Avenue. The landlord of the building had informed police earlier that evening that an African-American man matching Singer's general description had been "keeping company with" the daughter of the tenant in the third floor unit. The information provided by the landlord must be understood in conjunction with the information provided by the cellular ping. Specifically, despite the lack of detail provided by the landlord, his information must be understood as merely narrowing the scope of the search further, from the very small target area of 239 Knickerbocker Avenue. The only question remaining at that point in time was in which unit were the police most likely to find the suspect. In evaluating the reasonableness of the officers' conclusion that the suspect was in the bedroom, we also must consider Valvo's statement to the police that there were two African-American men in the bedroom at that very moment.[15]

Accordingly, once the police had the information from the cellular ping, the pool of potential suspects was not African-American men generally, or even Afri-

can-American men within the city of Stamford, but African-American men at that particular address. There is no indication in the record that the landlord identified any other African-American men associated with any of the units at 239 Knickerbocker Avenue. Viewed in that light, the landlord's information, which by itself clearly would have been insufficient subsequently to support a reasonable belief that immediate entry into the bedroom was necessary to protect those present, provided an important piece of additional information by narrowing the target area to the third floor unit. Finally, when they entered Valvo's apartment to investigate further, they learned that there were two African-American men behind the partially open bedroom door, which was close enough to where they stood that whoever was behind the door could have heard the entire conversation that the police had with Valvo.

Viewed under the totality of the circumstances, we conclude that the trial court properly concluded that exigent circumstances justified the entry into the bedroom. The officers reasonably believed that the entry was necessary for their own protection, as well as the protection of others in the apartment. We emphasize that although the level of certainty that officers had regarding the presence of Singer or some person associated with him in the bedroom is relevant to our inquiry, we examine that question in light of the overall question of whether it was reasonable for the police to believe that immediate entry into the bedroom was necessary to protect the safety of those present. We also emphasize that it was unnecessary for the officers to have a level of certainty approaching probable cause to believe that Singer or an associate was present in the apartment. It was sufficient that the facts known to them at the time would support a reasonable belief that a person or persons in the bedroom—either Singer or a person connected to him—posed a threat of danger to the officers and others present.

That standard is satisfied in the present case. In that small apartment, with the information that the police had available to them, it would have been unreasonable and dangerous for the police to fail to take the final step of entering the bedroom to neutralize Singer or an associate, before that person could threaten the safety of the officers and others present in the apartment. The United States Supreme Court has recognized that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." (Internal quotation marks omitted.) *Kentucky* v. *King*, U.S. , 131 S. Ct. 1849, 1860, 179 L. Ed. 2d 865 (2011). The factual circumstances known to the officers at the time of the warrantless entry in the present case constituted precisely the type of circumstances envisioned by the United States Supreme Court. As Guzda testified at trial:

"We're looking for somebody who supposedly had a handgun. For everybody's safety, we're gonna check that apartment. I'm not gonna wait to get shot through a door, when he hears that we're out there."

We find unpersuasive the defendant's contention that the information relied upon by the police was insufficient to support a reasonable belief that immediate entry into the bedroom was necessary. Specifically, the defendant contends that the information available to the police at the time of the warrantless entry did not rise to the level of "specific and articulable facts" required to support a reasonable belief that immediate entry was necessary. See *Terry* v. *Ohio*, supra, 392 U.S. 21. Put another way, the defendant argues, the police did not have sufficient information to support a reasonable belief that Singer was in the bedroom. As we already have indicated, however, the police had sufficient information to support precisely that reasonable belief. The police methodically, in a very short time period, followed a logical chain of clues that pointed to the presence of Singer in the third floor apartment at 239 Knickerbocker Avenue, beginning with the cellular ping, then to the landlord's information, and finally to Valvo's statement that there were two African-American men behind the bedroom door. Standing alone, none of these pieces of evidence would suffice to support the officers' reasonable belief, but we must view them together.

The defendant's argument in support of this contention is three-pronged. He challenges the value of the cellular ping, claims that the landlord's description was too vague, and relies on disputed facts regarding the exchange that occurred between Valvo and the police. As to the ping and the landlord's description, the defendant claims that the cell phone was pinged hours before the police arrived. As we already have observed; see footnote 5 of this opinion; the record does not reflect when the ping occurred, and the most that the trial court could have inferred is that it occurred sometime after the cell phone number was provided to police and before Whipple relayed the information from the ping to the Stamford police. The defendant also suggests that the police improperly relied on the witness' statement that Singer was using the cell phone in question at the time, despite the fact that the cell phone was not registered to Singer. He also questions the inference drawn by the police that Singer would have retained the cell phone when he fled. He additionally points to the vagueness of the landlord's description, which was merely that a black male was associated with the third floor unit. The defendant seeks a level of certainty not required by the law. Certainly, if the police had asked the cell phone company to perform a subsequent ping immediately prior to entering the apartment, yielding the same address, if the cell phone had been registered to Singer rather than to Pettigrew, and if the landlord

had described the man associated with the third floor apartment as a light-skinned, African-American male, approximately five feet, ten inches tall, with teardrop tattoos on his face, the police would have had a level of certainty approaching probable cause to believe that Singer was present in the apartment. But our law requires only a reasonable belief when exigent circumstances are present. As we have explained, the information available to the police at the time they entered the bedroom was sufficient to satisfy that standard. Regarding the defendant's reliance on disputed facts in the exchange between the police and Valvo, the defendant points only to those facts that would not support the trial court's ruling on the motion to suppress. That reliance is not consistent with the standard of review on a motion to suppress.

Finally, the defendant also argues that in order for the exigent circumstances doctrine to apply, the state bore the burden to establish that there was insufficient time to secure a search warrant for the apartment. The defendant's argument, which ignores the fact that the police were lawfully in Valvo's apartment with her consent at the time that the exigency arose, is one that we rejected in *State* v. *Aviles*, supra, 277 Conn. 303, where we explained that "even if we were to assume that the police could have obtained an arrest and search warrant for the defendant prior to [the police officer] entering the premises, this fact does not mean that their failure to do so necessarily invalidates the warrantless conduct that followed. We reach this conclusion because, by obtaining consent to enter the apartment, [the police officer] was already lawfully in a position to observe the exigent circumstances that justified his further actions." Similarly, in the present case, the police were lawfully present in the apartment when they became aware of the circumstances justifying the warrantless entry into the bedroom.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to render judgment affirming the judgment of the trial court.

In this opinion ROGERS, C. J., and ZARELLA and EVELEIGH, Js., concurred.

[1] Hereinafter, unless otherwise indicated, all references to § 53a-217 are to the 2007 revision of the statute. Although the judgment file indicates that the defendant was convicted of criminal possession of a pistol or revolver in violation of General Statutes (Rev. to 2007) § 53a-217c, that appears to have been a scrivener's error. The long form information charged the defendant with a violation of § 53a-217 (a) (1); the court consistently instructed the jury during trial that the defendant was charged with violating § 53a-217 (a) (1); and the jury's verdict found the defendant guilty of violating § 53a-217 (a) (1). At sentencing, the court mistakenly referred to General Statutes (Rev. to 2007) § 53a-217c, but the court imposed the mandatory minimum sentence of two years required under § 53a-217 (b), which clarifies that the statute under which the defendant was convicted was § 53a-217, not General Statutes (Rev. to 2007) § 53a-217c, which does not specify a mandatory minimum sentence.

[2] This court granted the state's petition for certification to appeal, limited

to the following question: "Did the Appellate Court properly determine that the trial court improperly denied the defendant's motion to suppress based upon the exigent circumstances of a warrantless entry?" *State* v. *Kendrick*, 303 Conn. 925, 925–26, 35 A.3d 1076 (2012).

[3] Prior to the defendant's arrest, New Jersey police did not have any information regarding Pettigrew's identification. The record is somewhat unclear as to who she is. Whipple testified that police subsequently had learned that Pettigrew is the defendant's mother, but the trial court stated in its memorandum of decision that she is Singer's mother.

[4] The record does not reveal any details regarding the precise nature of a cellular ping, the technology involved, or its accuracy. No expert testimony was offered, and Whipple acknowledged during his testimony that he was not an expert on cell phone technology or the process of "ping[ing]" a cell phone.

[5] The record does not reveal when the cell phone company performed the ping. The trial court properly could have inferred, however, that the cell phone company could have performed the ping only after the witness provided Pettigrew's cell phone number to the New Jersey police—which must have occurred sometime after the victim's body was discovered on the morning of May 11, 2008—and sometime before Whipple spoke to the Stamford police on May 12, 2008.

[6] The defendant relies on two items of testimony offered during trial that he claims conflict with Whipple's testimony during the suppression hearing that the cellular ping defined a target area within a few yards. Although the testimony that the defendant points to was not presented at the suppression hearing, we review the record in its entirety to determine whether a defendant's constitutional rights were infringed by the denial of a motion to suppress. See *State* v. *Fields*, 265 Conn. 184, 191, 827 A.2d 690 (2003); *State* v. *Toste*, 198 Conn. 573, 576, 504 A.2d 1036 (1986). The mere fact that some of the testimony on which the defendant relies could have supported a ruling contrary to the trial court's ruling on the motion to suppress, however, does not require reversal. While it is true that we scrupulously examine the record when "a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights . . . and the credibility of witnesses is not the primary issue," our inquiry is aimed at discerning whether there is substantial evidence to *support* the trial court's ruling. *State* v. *Boyd*, 295 Conn. 707, 717, 992 A.2d 1071 (2010), cert. denied,      U.S.     , 131 S. Ct. 1474, 179 L. Ed. 2d 314 (2011). The defendant relies on the testimony of Sergeant Paul Guzda of the Stamford Police Department and DeMeo at trial. Specifically, during cross-examination, Guzda stated that the information that the New Jersey police provided to the Stamford police regarding the area yielded by the cellular ping "initially . . . may have been more general." He immediately clarified, however, that "when we finally made our decision to go [to 239 Knicker-bocker Avenue], most of the information came from one of the [New] Jersey officers." Reading Guzda's testimony in its entirety, therefore, reveals that he stated that the information that he received from the landlord at that address did not "narrow down" the initial target area identified by the ping. Instead, the landlord's statement merely "reaffirmed" the information that the New Jersey police had conveyed, namely, that on the basis of the ping, they believed that Singer was located at 239 Knickerbocker Avenue. Guzda's trial testimony, therefore, is consistent with Whipple's testimony at the suppression hearing.

DeMeo's testimony is inconsistent with the implicit finding of the trial court that the cellular ping limited the search area to 239 Knickerbocker Avenue. Like Whipple, DeMeo prefaced his statements by admitting that he is not an expert on the process of pinging a cell phone. DeMeo suggested that a cellular ping yields a location narrowed "down to a street" and that the identification of a more precise location requires investigative follow up. The trial court, however, was free to credit the testimony of other witnesses, specifically, Whipple and Guzda, who testified that the cellular ping limited the search area to 239 Knickerbocker Avenue, and that subsequent police investigation merely confirmed that information and narrowed the target area down further to the third floor unit. The testimony of those two witnesses provides substantial support for the trial court's ruling.

[7] Both the defendant and Singer are African-American. The precise nature of the description that Guzda provided to the landlord is not clear from the record. On cross-examination, he acknowledged that he did not "feel comfortable sharing too much" information with the landlord. He also admitted that the description that he provided could have fit numerous black men.

Whipple testified that while the New Jersey police were en route to Stamford, he contacted the Stamford Police Department and described Singer as a black male, approximately five feet, ten inches tall, with facial

tattoos, but neither he nor Guzda testified that this description was communicated to Guzda in particular, or that Guzda provided this description to the landlord. It is undisputed that the New Jersey police did not provide a photograph of Singer to the Stamford police before they arrived in Connecticut.

[8] Although the focus of the investigation at that point in time was the apartment on the third floor, the police officers knocked on the doors to all of the apartments in the building that night.

[9] We additionally observe that the defendant did not file a motion for articulation seeking to have the trial court clarify any findings it had made that may have resolved the inconsistencies.

[10] Although Valvo disputed at trial that she consented to the officers' entry into the apartment, the defendant does not contest this issue on appeal.

[11] As we have explained, the remaining details regarding the exchange between the police and Valvo were in dispute. There were four different accounts. Guzda testified that when he and Delgado entered the apartment, they questioned Valvo, asking her whether she knew Singer, and she responded that she did not recognize the name and did not know what they were talking about. She also responded, however, that her daughter was in the bedroom with two African-American men. Guzda expressed doubt, when pressed, that anyone would have had time to show Valvo a photograph of Singer before the police entered the bedroom.

By contrast, Whipple testified that after they explained to Valvo that they were looking for Singer, he showed her a photograph of Singer. He did not recall that Valvo responded that she did not know Singer, just that she pointed toward the bedroom door and stated that her daughter was in there with two African-American men. Whipple also testified that Valvo gave the police permission to enter the bedroom.

Delgado testified that she questioned Valvo, and asked her who lived in the apartment with her. When Valvo replied that her daughter lived there, Delgado asked if the daughter was home at that time. Valvo responded yes, with two friends. When Delgado asked who the friends were, Valvo responded that they were two black males, then she pointed to the bedroom.

Valvo testified that when the police entered the apartment, they showed her several photographs of individuals, and when she responded that she did not recognize the individuals in those photographs, the police showed her a photograph of the defendant. She indicated that she knew the defendant and when they asked where he was, she pointed to the bedroom door.

[12] The defendant argues that this court must review the decision of the Appellate Court for abuse of discretion. The defendant relies on our decisions that have stated that "in a certified appeal, the focus of our review is not the actions of the trial court, but the actions of the Appellate Court. We do not hear the appeal de novo." (Internal quotation marks omitted.) *State* v. *Saucier*, 283 Conn. 207, 221, 926 A.2d 633 (2007). Apparently, the defendant reads our statement that we do not hear the appeal "de novo" to mean that the abuse of discretion standard applies to our review of the Appellate Court's decision. That reading is incorrect. The statement merely means that "[t]he only questions that we need consider are those squarely raised by the petition for certification, and we will ordinarily consider these issues in the form in which they have been framed in the Appellate Court." (Internal quotation marks omitted.) Id.

[13] For a protective sweep of the immediate area surrounding an arrestee, an officer does not need either probable cause or reasonable suspicion as such a sweep is justified as a precautionary measure. *Maryland* v. *Buie*, supra, 494 U.S. 334.

[14] We observe that because the officers entered the bedroom on the basis of their belief that immediate action was necessary to protect themselves and others in the apartment, and because the facts supporting that belief became known to the officers when they were lawfully present in the apartment, the protective sweep doctrine was also implicated by the facts of the case. The emergency doctrine was not implicated.

[15] Although we recognize that the ping was significant, the dissent places too much emphasis on that single piece of information. We must analyze the propriety of the entry into the bedroom on the basis of *all* of the information available to the police at the time that they were standing in Valvo's kitchen. As our analysis demonstrates, at that time, the ping was but one of a multitude of pieces of information that the police relied on to support their reasonable suspicion that Singer or one of his associates was behind the partially opened bedroom door. The dissent mistakenly focuses on what the trial court did not know about the ping itself, and accordingly

suggests that our focus should be on the information that the police did not have at the time that they entered the bedroom. To the contrary, our inquiry properly focuses on what information the police *did* have at the time of entry. Considering all of the facts known to the police, namely, the evidence that Singer had shot a man to death less than forty-eight hours prior to the search and was at large with the murder weapon, the ping, the information provided by the landlord, and the confirmation of that information by Valvo's statements, we conclude that even without the ping, the police would have had enough information—at the time that they were standing in Valvo's kitchen—to support their reasonable suspicion that Singer or one of his associates was behind the bedroom door.